## Swarthmore Borough *v.* Public Service Commission et al., Appellants.

*Street railways — Contract with borough—Municipal consent—Paving — Public Service Commission—Contracts—Constitutional protection—Police power—Act July 26, 1913, P. L. 1374.*

1. Municipal bodies in consenting to the use of their streets by railway corporations have a constitutional right to make the terms and state the conditions on which this consent is given, and when these terms are reduced to a contract, they are protected by the organic law, subject to the right of the State to vary them under the police power, when public interests so demand.

2. It is for the legislature and not the courts or the Public Service Commission to declare the public policy of the state, in regard to varying such contracts.

3. There is nothing in the Public Service Law to empower the Public Service Commission to vary a municipal-consent contract with a street railway company so as to relieve the latter from a covenant to pave the streets. Such authority cannot be derived from the right of the commission to regulate service and facilities.

4. Where authority is conferred on an extra-judicial body, not in the course of the common law, the legislative power to act in any particular case must be clear.

5. Contracts made by public service corporations are subject to revision by the Public Service Commission only in so far as they deal directly with rates.

6. A consent contract as to paving is not a rate contract.

7. The Public Service Commission has no jurisdiction to vary or modify a contract executed before the effective date of the Public Service Law between a borough and a street railway company, wherein the railway company, in consideration of obtaining a franchise in the borough, agreed to pave and keep in repair from curb to curb the roadway of the street occupied by the railway tracks.

Concurring opinion by Mr. Justice KEPHART; dissenting opinion by Mr. Justice SCHAFFER.

Argued Feb. 21, 1923. Appeals, Nos. 255 and 256, Jan. T., 1923, by Public Service Commission et al., from judgment of Superior Court, Oct. T., 1922, No. 23, reversing order of Public Service Commission, Complaint Docket of 1920, No. 3579, in case of Swarthmore Borough v. Public Service Commission, Philadelphia Rapid Transit Co. and Philadelphia, Morton & Swarthmore Ry. Co. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Appeal from Superior Court.
The opinion of the Supreme Court states the facts.
Order reversed. Public Service Commission and Philadelphia Rapid Transit Co. appealed.

*Error assigned* was judgment, quoting it.

*Frank M. Hunter,* with him *John Fox Weiss,* for Public Service Commission, appellant.—The Public Service Commission had jurisdiction over the contract: Perry Co. Tel. & Tel. Co. v. P. S. C., 265 Pa. 274; Coplay Cement Mfg. Co. v. P. S. C., 271 Pa. 58; New Street Bridge Co. v. P. S. C., 271 Pa. 19; Citizens Pass. Ry. v. P. S. C., 271 Pa. 39; Phila. & Reading Ry. v. Commission, 67 Pa. Superior Ct. 604; Fogelsville, etc., Elec. Co. v. Pa. P. & L. Co., 271 Pa. 237; Collingdale Borough v. P. R. T., 274 Pa. 124.

The paving of Yale Avenue outside the railway strip at the expense of the respondent obstructs or tends to obstruct the full performance of the statutory duty to render adequate service at reasonable rates.

The ordinance obligation sought to be enforced is no longer reasonable: Norristown v. Ry., 148 Pa. 87; Phila. v. Ry., 177 Pa. 371; Williamsport v. Ry., 206 Pa. 65.

*Frederick L. Ballard,* of *Ballard, Spahr, Andrews & Madiera,* with him *C. J. Joyce,* for Philadelphia, Morton

& Swarthmore Street Railway Co. and Philadelphia Rapid Transit Co., appellants.—The order of the commission defining the street paving to be furnished by appellant was within the commission's power: Citizens Pass. Ry. v. P. S. C., 271 Pa. 39; New Street Bridge Co. v. P. S. C., 271 Pa. 19.

The ordinance contracts do not defeat the commission's jurisdiction or impair its power to make the order here involved: Wilkinsburg Boro. v. P. S. C., 72 Pa. Superior Ct. 423: Foltz v. P. S. C., 73 Pa. Superior Ct. 24; Scranton v. P. S. C., 73 Pa. Superior Ct. 192, s. c. 268 Pa. 192.

*Albert N. Garrett,* and *W. Roger Fronefield,* for appellee.—It is the duty of a street railway company to keep its right-of-way in good condition and repair, even in the absence of express contract so to do: Reading v. Trac. Co., 202 Pa. 571; Reading v. Trac. Co., 215 Pa. 250; Chambersburg Boro. v. Ry., 258 Pa. 57; McKeesport v. Ry., 55 Pa. Superior Ct. 47; Carlisle v. Ry., 245 Pa. 561.

There is no proper legislation authorizing the Public Service Commission to relieve the transit company from carrying out its contract: Ry. Co. v. P. S. C., 271 Pa. 39; Citizens Pass. Ry. v. P. S. C., 271 Pa. 39.

The ordinance in question is not a rate contract: Ben Avon Boro. v. Water Co., 68 Pa. Superior Ct. 561; Coplay Cement Co. v. P. S. C., 271 Pa. 39.

The courts have the power and jurisdiction, since the Public Service Commission Act, to specifically enforce a contract between a transit company and a borough, in which contract the transit company agrees to repair a street: Sayre Boro. v. Trac. Co., 270 Pa. 412; Chambersburg v. Elec. Co., 258 Pa. 57; Collingdale v. P. R. T., 274 Pa. 124.

If this is correct, the commission has no jurisdiction over such a contract: St. Clair v. Ry., 259 Pa. 462; Bellevue Boro. v. Ohio Valley Co., 245 Pa. 114; Fogleville

Ry. v. Light Co., 271 Pa. 237; Leiper v. R. R. Co., 262 Pa.
328; New Brighton v. Water Co., 247 Pa. 232.


OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, May 14,
1923:

In this case, the Superior Court reversed an order of
the Public Service Commission; that body and the oper-
ating company hereinafter named have appealed.

The relevant facts are fully set forth in the opinion of
the tribunal from which these appeals were taken (Bor-
ough of Swarthmore v. Pub. Serv. Com., 80 Pa. Superior
Ct. 99), and, for present purposes, it is sufficient to state
that in 1900 the Philadelphia, Morton & Swarthmore
Railway Company entered into a contract with the Bor-
ough of Swarthmore, whereby the latter consented that
the former might occupy Yale Avenue, on condition that
it keep the roadway in good order and repair "from curb
line to curb line"; since 1918 this contract (evidenced
by an ordinance) has not been adhered to by the Phila-
delphia Rapid Transit Company, which in 1906 suc-
ceeded to the rights and obligations of the original gran-
tee; hence the borough filed a complaint with the Public
Service Commission asking that it issue an order com-
pelling performance of the obligation in question. After
hearing, the commission made its findings of fact, among
others, that the cost of performing the contract to the
letter constituted an unjust burden upon the operating
company, which its net receipts attributable to service in
the borough would not warrant, and, instead of directing
that the avenue be kept in repair from curb to curb, as
requested by petitioner, the commission ordered that the
Rapid Transit Company should "maintain and keep in
repair that portion of Yale Avenue......which lies be-
tween its rails and to the end of its ties," and directed
that it should "not pave or maintain that part......out-
side of the railway strip."

The decision of the Superior Court reversing the above
order is based on the ground that the Public Service

Company Law, as drawn, does not vest in the commission power to vary, or relieve respondent corporation from, the contractual obligation here involved; that, granting, but not deciding, the legislature might have conferred such authority, in its exercise of the police power, this has not yet been done.

Appellants contend that, since this court in several decisions has held consent-to-enter-territory contracts, between municipal bodies and railway companies, fixing a minimum rate of fare, may be varied by the Public Service Commission and a higher rate approved, "the commission is just as free to prescribe a measure of service or facility different from that specified in such a contract"; and that, in this instance, "the commission has power to prescribe the paving [the operating company] shall furnish, untrammeled by the terms of the present ordinance, precisely as in a rate case." The "basic grant" of this authority, appellants claim, is found in article V, of the Public Service Company Law; they think it not only comprehended in section 1 of this article, conferring on the commission, "in general language," the power to "regulate rates, service and facilities of public service companies," but that it finds a "vital source" in sections 2 and 3, referring to "service, facilities, rules, regulations and practices" of these corporations and the returns they are entitled to receive. Furthermore, appellants contend that, in the present case, the paving obligations, imposed in 1900 by the consent-ordinance before us, are illegal under present-day conditions, because unreasonable, unjust and in effect discriminatory, and because their enforcement will prevent the operating company from furnishing and maintaining proper service at reasonable rates, as required by article II, section 1, paragraphs a and b, of the act. Finally, on the grounds stated and for the reasons specified, appellants say the powers given the commission were properly exercised in this case, and the Superior Court erred in deciding otherwise.

We cannot sustain any of the above contentions. To begin with, section 1, article V, of the Public Service Company Law does not, as appellants at times seem to think, confer on the commission general authority to regulate public service companies; on the contrary, it states, in effect, that the commission shall have only the administrative powers and authority "provided in this act." Next, when the legislation is read from beginning to end, there is no special authority granted the commission to make an order varying the terms of a consent-ordinance, like the one now before us, in the manner or to the extent here undertaken, and this power cannot be implied from any of the general provisions of the statute. There is no room to argue that the authority in question can be derived from the right of the commission to regulate service and facilities, since the terms "service" and "facilities" are particularly defined in art. I, sec. 1, of the act, and, without restating the definitions there found, we hold that the control over them (service and facilities) given by the statute does not comprehend such a power as here exercised. In contending to the contrary, appellants rely chiefly on the word "facilities," but as this word is defined in and used throughout the act, it always means something either owned by or under the control of a public utility and actually employed in the service it renders the public; while the term "service" always refers to the service which such a corporation owes to its patrons, employees, and the public in the performance of its charter obligations. Until the law-making power directs otherwise, "the duty assumed [under a contract like the one before us, to keep a street in repair] is not to be evaded because the burden may reduce the income below a reasonable return on its investment;" that duty "must be complied with, no matter how onerous, unless stricken down by some proper legislative assertion of the police power" (Collingdale Boro v. Phila. R. T. Co., 274 Pa. 124, 127), and no appropriate assertion of that power appears in the present case.

If the commission were allowed to exercise authority not conferred on it, either in specific words or as necessarily comprehended in some other power expressly granted (Citizens P. Ry. Co. v. Pub. Serv. Com., 271 Pa. 39, 54), all the contracts and the general management of the business of the public utilities of Pennsylvania might, in course of time, be subjected to the control of that body, although no such condition of affairs is contemplated by the act. In other words, the evil effects of not adhering to the rule, that the authority of all extrajudicial bodies must clearly appear, soon would reach beyond the confines of this controversy and might invade the whole field of public control. The only safe and proper roads for administrative bodies like the present commission to travel are those plainly marked by the acts of assembly defining their duties, and to these the courts must confine them, if the system represented by such commissions—to which our body politic seems committed—is to work out as intended by its creators, the legislature.

We have held in more than one case that municipal bodies, in consenting to the use of their streets by railway corporations, have a constitutional right to make the terms and state the conditions on which this consent is given (Allegheny v. Millville, E. & S. St. Ry. Co., 159 Pa. 411, 418; Carlisle & Mechanicsburg St. Ry. Co.'s App., 245 Pa. 561, 566-7; Valley Rys. v. Mechanicsburg Boro., 265 Pa. 222, 226, and other recent cases), and that, when these terms and conditions are reduced to a contract, they are protected by the organic law, subject to the right of the state to vary them, under the police power, when public interests so demand (Collingdale Boro. v. Phila. R. T. Co., 274 Pa. 124, 127) ; but it is for the legislature (and not the courts or the Public Service Commission) to declare the public policy of the state in this regard (Collingdale Boro. v. Phila. R. T. Co., supra; Com. v. Vrooman, 164 Pa. 306, 316), and, when it sees fit to designate the instruments to carry out its dec-

larations, neither the courts nor the commission possess the right to expand or abridge a declaration or grant of power so made. The only legislative declarations we have at this time, on the subject in hand, are those contained in the Public Service Company Law (Act of July 26, 1913, P. L. 1374); and, as already explained, we agree with the Superior Court that this statute does not empower the commission to vary a contract such as the one now before us in the manner or to the extent attempted in the present case. Where authority is conferred on an extra-judicial body, "not in the course of the common law," the legislative grant of power to act in any particular case must be clear: Citizens P. Ry. Co. v. Pub. Serv. Com., 271 Pa. 39, 54.

Under our decisions to date, contracts made by public service corporations have been held subject to revision only in so far as they deal directly with rates, and agreements of this character have been so held because article V, section 3, of the Public Service Company Law clearly grants that revisory power to the commission. So far as our cases show, contractual obligations of the nature of the one here involved have been treated as though not within the jurisdiction of the commission, and, accordingly, enforced by the courts (Sayre Boro. v. Waverly, etc., Trac. Co., 270 Pa. 412; Chambersburg Boro v. Chambersburg & Gettysburg Elec. Ry. Co., 258 Pa. 57); the present complaint was correctly disposed of on that ground.

"It would require a very clear case of the contravention of some controlling and paramount principle of public policy to justify an interference......[with] the unlimited constitutional grant" of power conferred (by article XVII, section 9, of the Constitution) on local bodies, to impose an obligation like that before us: Allegheny v. Millville, etc., Ry. Co., supra, p. 416. No such paramount principle appears to govern the present record in appellants' favor, nor, as yet, has a fitting rule of public policy or grant of power, under which they can

get relief in the manner here attempted, been announced by the legislature of Pennsylvania, and that fact controls this case.

Excerpts from our opinions construing the Public Service Company Law have been cited by each side of this controversy, to sustain their respective contentions, different parts of the same opinion in some instances being called to our attention by both appellants and appellee; none of these decisions rules the points presented on this appeal, and the language of each of them must be read in connection with the particular facts there involved, just as all here written must be so understood.

The judgment of the Superior Court is affirmed.

CONCURRING OPINION BY MR. JUSTICE KEPHART:

The Philadelphia, Morton & Swarthmore Street Railway Company, in 1900, entered into an agreement with the Borough of Swarthmore to keep in good order the roadway, from curb to curb, and the bridges, flagstones, gutters and drains along the route of the railway through the borough. The enacting clause of the ordinance grants to the company the right, "under certain conditions, to construct, maintain and operate an extension of its street railway in the borough," some of the conditions being those just recited.

The majority opinion does not deny that the legislature, through its police power, could reach this contract, especially as it is made by one of its own creatures, a borough. What it decides is that the legislature has not undertaken to place, within the regulatory control of the commission, authority to modify or annul a contract such as this. I am forced to reach the same conclusion on that branch of the case, but from a different viewpoint. My thought accords more with the dominant thought expressed in Citizens Pass. Ry. Co. v. Public Service Commission, 271 Pa. 39, which opinion is, as I understand it, more in keeping with the correct philosophy of the act. My objection to the majority opinion

is that it sticks too close to the literal meaning of the language used, and disregards the import of the words in the light of the subject-matter with which they are dealing, imposing on them a meaning distinct from their practical use, as well as contrary to the spirit and purpose of the law. It seems to hunt for a special line for each authority exercised by the commission. That is not possible in treating so vast a subject, and the contrary was appellant's chief contention in this case, as it was in the Citizens Case, supra. The decision there was predicated entirely on the outstanding scheme and purpose of the act.

To bring out clearly what I wish to emphasize on this subject, it is necessary to repeat certain facts. The gross revenue per year of this company is $10,080; annual operating expense, $9,070; net revenue, approximately $1,010. The borough's demand at this time would cost the company from fifteen to twenty thousand dollars immediately, with an annual maintenance charge of from two to five thousand dollars. When this agreement was written the traffic on the road was that of the normal vehicular (horse and wagon) traffic. To-day the road is traversed by heavy trucks, weighing from five to ten tons, and high powered automobiles, with little if any of the traffic that existed in 1900. Bus lines, in competition with appellant, pass along this highway. The order of the borough, if complied with, compels the company to maintain and keep the highway, under present-day conditions, in repair at all times for its competitors.

This the company declines to do, and can fairly claim the benefit of the well recognized principle of law that contracts are to be interpreted as of the time they were written and also as to what the parties then had in view. "A familiar rule of construction is that a contract will be construed in the light of the subject-matter and conditions existing at the time of its execution and that it comprehends only those things in respect to which it appears the parties proposed to contract and its provisions

will not be extended to cover others apparently not thought of or intended to be included. Case v. Cushman, 3 W. & S. 544; Smith's Est., 210 Pa. 604; Hay v. Baer, 48 Pa. Superior Ct. 231": Silverthorn v. Silverthorn 276 Pa. 579. Appellee could not hold appellant to anything beyond that contemplated in the contract of 1900; that was to repair the roadway as often as it was necessary for the traffic that was then borne by the highway. If the borough wants a more substantial road for increased heavy travel, it must look elsewhere for additional money to build it. Having submitted itself to the commission's jurisdiction, if error was made in limiting the scope of the order, the commission still had the power to restrict the exactions of the borough to that contemplated by the contract. This court, in the exercise of appellate power, could so limit the contract's operation. It is possible less grievous harm would be done if the question were adjusted in that light.

Turning to the main proposition, which is, the right of the public service commission to strike down the present contract, a far different question is presented.

The act is defined as an act to regulate public service companies by defining their duties and liabilities, limiting their powers, and creating a commission to effect this purpose.

The commission's first duty is to regulate the company in the interests of public welfare. This is accomplished through adequate service, and it is here appellant says the commission has the power to examine, modify or strike down the contract.

Adequate service is used comprehensively, and is just what the act says (article I). "The term 'Service' is used in this act in its broadest and most inclusive sense, and includes any and all acts done, rendered or performed, and any and all things furnished or supplied, and all and every the facilities used or furnished or supplied by public service companies in the performance of their duties to their patrons, employees, and the public,

as well as the interchange of facilities between two or more public service companies." It will be noted service includes facilities as well as every attribute that goes to make up, as here, the railway as a going concern, giving good service to the public. It is this broad language through which the commission operates to enforce the performance of the duty to the public.

Adequate service (article II) comprehends something to be done by the company in the interest of the public. It is the direct accomplishment of its charter purpose and duty, whether it relates to schedules, fares, cars, roadway or facilities, it matters not. While additional described or improved service may be ordered, necessitating increased facilities of sundry character, the manner and means of executing these orders, the instrumentalities or facilities used, are for the managers of the company. The commission looks to the result in service. It does not manage, but regulates. The company spends its money as it sees fit. It can adopt any plan it wishes, and the commission cannot directly stop it. This contract may have been for service betterment; if so, it relates to the means by which service is accomplished. The commission may consider its subject-matter as a rate factor in a rate base; but of this we shall speak later.

Service moves from the company, has relation to its duty, and, while dependent on rates, the two must not be confused. Service is what the patron gets and pays for. The rate is the consideration that the company receives for the service. As service is understood and defined, by no stretch of the imagination can this contract be considered service or any of its allied elements.

It may be properly observed that, apart from regulation of health, safety and kindred subjects, each and every duty or liability imposed on a public service company by law and enforced by the commission necessarily has relation to some member of the public, interested or expectantly interested through contractual relations.

Through whatever avenue we may approach public service questions, it must always be on the basis of a contractual or quasi-contractual relation, or a relation described in one of the opinions as bargain and sale.

This relation, generally speaking, exists through "rates" or "tariffs.". There is no such thing as a gratuitous duty or liability within contemplation of the public service law. Every service is presumed to be paid through rates. Take, for instance, a complaint as to train schedules. It is not dealt with on ethical, religious or æsthetic grounds; nor may it be said to be in the interest of safety or health, though it may be of public comfort. It is primarily based on the fact that people expect to be placed in contractual relation with the company, as for example, passengers paying a rate of fare. If such were not the case, the complaint would be short-lived. Grade crossings contemplate as well safety to patrons as to the public.

The term "rates," however, does not comprehend merely the price at which a particular service is given or commodity furnished. There is a rate base embodied within it all the essentials that go to make up, as it has been properly termed. A rate base is the sum total of the various elements entering into cost in its broadest sense. Rates are prices fixed in varying sums for varying service to cover cost plus incidentals or additional essentials. Rates are never fixed except on some basis of capital return and cost. The latter has still further indefinite relation to the public generally, in capacities different from those using the commodity which the rate controls.

Here we have a contract intimately associated with a public service company, and it is a part of rates if a part of the base on which the rate is built, but it is not in and of itself a rate contract. The difficulty lying in the path of appellant is that, as to this class, the commission can take no direct action; it must or may do so indirectly. It is but one of the elements that make up the whole; it

cannot be segregated and independently examined and regulated. Its worth or value may be fixed and reflected in rates or revenue, and, to the extent that it is so reflected, the commission indirectly considers the subject-matter of the contract, but, as stated, not by segregation, with separate and independent action.

Here again appellant seeks to control the contract; as the duty of adequate service is a legal and a charter obligation, so the company has a similar and more important right, that is to "receive......fair......rates...... for each and every service rendered," that they may comply with the public duty. Adequate service and reasonable rates must go hand in hand.

What, then, should be considered when the term "rate" is mentioned, and to what extent may the commission inquire and determine the elements founded on contract entering into a rate base?

As stated above, the commission does not deal directly with the persons selling supplies or rights-of-way, etc., to the company. Its acts may indirectly have a great bearing on the subject-matter of their contracts. This subject-matter, however, can be reached only through an investigation of rates, including all their elements. In such case, it is considered (1st) if included in fair value as a capital charge, through a per centum allowance; (2nd) if as an element of operating cost, then in the sum total of the latter; these two items, with others mentioned,—depreciation, etc.,—are the prime factors or structure on which rates are built or made. If the specific matter is disallowed on both grounds because excessive as a franchise charge, improvident expenditure or not useful as capital expenditure, it must be met by the company in other ways. The public pays only for expenditures used or useful in adequate service, present or reasonably prospective. It is not called on to pay for foolish bargains or excessively inflated prices.

The question of fair value generally has been passed on, and needs no further discussion at this time. Oper-

ating charges, and the availability of contracts like this one, as such, have not been passed on; nor have such contracts as a capital charge.

The commission is required by law to allow reasonable operating charges. It is not bound to accept all the many items as a part of operating charges without regard to their availability, usefulness or excessiveness; it is not compelled by law to accept operating charges improvidently and unwarrantably made by former officers (rents, for instance). But in refusing it does not strike down the contract. It simply omits, as capital or operating costs, all or a part of the offending items. The commission, under its general powers, does not strike through the operating cost and reach the contract or the third person to the contract, or the individual dealing with the company, and say to them, "You must reduce your price or cancel your contract." The mere fact it may form part of a rate base under the public service law does not warrant such an idea. It may be reached indirectly, through rates, as stated by Mr. Justice SIMPSON in Citizens Pass. Ry. Co. v. Pub. Serv. Com., supra, 55, 56, "No contract made by a utility is subject to a direct attack and revision, unless it is itself a rate contract; and no contract may be indirectly reviewed in such cases, unless it has some relation to one or more of the elements to be considered in revising the rate."

If this is a proper operating charge,—and it is only in exceptional cases there is much dispute on this item,—or capital charge, then a rate must follow that will meet it. If the reasonable cost of operation exceeds the gross revenue of the company, and the rate on the commodity or the traffic is all that the commodity or traffic will bear, then the parties must be left to dissolution, as Mr. Justice SADLER points out in the Norristown Case, just filed, 277 Pa. 459.

The commission, in fixing a rate which shall yield a fair return, and permit the company to function, does not guarantee that business will be done under the new

rate. If the traffic or commodity will stand it, they must fix a rate that will meet all expenses and charges enumerated. If this is not a proper operating or capital charge, its payment must come from the difference between the cost of operation, fixed charges and gross revenue.

"Besides, neither the commission nor the public has anything to do with the disposition of the rates which the utility is authorized to collect; nor is it any concern of either that the sum total thereof may not be sufficient to enable the operating company to pay its fixed charges and maintain or extend its service and facilities. The company is entitled to receive a reasonable return for the service it furnishes, and no more; the public is entitled to receive an adequate return for the reasonable rates it pays, and no more. Beyond making sure of these two things, the statute does not vest a greater power in the commission, so far as the matter under consideration is concerned": Citizens Pass. Ry. Co. v. Pub. Serv. Com., supra, 56.

If the rate will bear no further increase, or if there is no net balance to pay on account of the subject-matter of these contracts, the commission possesses no power to call in those who serve the company and order them to reduce their prices. The commission cannot be accused of confiscation merely because it does not ratify grossly exorbitant costs to be included in capital or operation, or in declining to honor, as such charges, items clearly irrelevant as such, or in declining to order a rate the traffic will not bear. The legislature never intended the public service commission to be guardian over service companies, insure solvency, dividends, or prevent improvident acts of managers who act under a misconceived state of facts. Nor can any power such as here exercised be predicated on the commission's general, supervisory and regulatory control under article V, with special reference to sections 2 and 13.

Much stress is laid on Scranton v. Public Service Commission, 268 Pa. 192, but here we have another question. The ordinance there limited the right to raise the rate to one that would permit performance of a public duty; it is at this point that adequate service and rates are inseparable. An effort was made to stop the hand of the state in securing adequate service.

The commission deals directly with the rate base in fixing a rate; in so dealing, it indirectly affects third persons (Citizens Pass. Ry. Co. v. Pub. Serv. Com., supra; New Street Bridge Co. v. Pub. Serv. Com., 271 Pa. 19). But in Scranton v. Pub. Serv. Com., supra, Leiper v. Baltimore & Philadelphia R. R. Co., 262 Pa. 328, and other cases of the same kind, the commission found the rate base established; the rate required for adequate service could not be imposed because of preëxisting contracts limiting that right. The control of the rate as it directly affected adequate service or public duty was the reason for state interference, and this contract or rate directly concerned the patron or consumer. [We have, in the present case, as far as this record goes, an unlimited right in the company and the commission to fix any rate that the traffic will stand.]

The theory upon which the Scranton and other like cases were decided, as has often been repeated, and now reasserted, was, such contracts were made in contemplation of the fact that at some time the State might step in and exercise its regulatory control over these companies. This intervention was built on the theory that the company had a paramount duty to the public that must not be frustrated. If such duty was interfered with by contracts that would ultimately destroy the company life, the good of the public would be to that extent injured. Included within this comprehensive purpose is, primarily, adequate service; then there are charter obligations, monopolistic and noncompetitive features, —the public have been taught to depend and rely for daily business and social intercourse on public service

instrumentalities,—and, lastly, discrimination; all of these matters, grouped under the general head of public good, force the state to declare that it will not permit rate contracts limiting the company's right to adequate return to stand in the way of the general public good.

The primary purpose, and what we are just now concerned with, is adequate service; all contracts were made with the idea that such service could be given and continued under the then contracted rate, and if it could not, the rate specified must yield to one that will. But all rates, however made, must yield to the rule that they can only be such as the public will stand or pay.

The contract concerning rates was not stricken down; the new rate is supposed to be written into the contract, unless the other party elects to regard it as abrogated. The contract having relation to an operating or capital cost is not stricken down. While the commission may refuse to give it a place as operating or capital charge, it still continues to live as a subsisting obligation against the company, to be paid for by the company in some other way than from the costs mentioned.

Adequate service cannot be secured without a reasonable return; that is fundamental. A reasonable return embodies a rate base sufficient to cover all reasonable charges, and no more.

The commission has no power to take up a purely private question between a company and an individual concerning an element entering into a rate base.

DISSENTING OPINION BY MR. JUSTICE SCHAFFER:

Superior to the constitutional provision giving a municipality the right to consent or not to consent to the occupation of its streets by a street railway company, stands the constitutional guarantee of the completeness of the State's police power. This is what the Scranton Case (268 Pa. 192) determines, as I read it. It is there said that, while the provision requiring the consent of a municipality is clear, it must be read in connection with

the equally clear third section of article XVI, which declares "the exercise of the police power of the State shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general wellbeing of the State." In calling into play its police power, the State exercises one of the highest attributes of sovereignty. "The very existence of government depends on it......It has been described as the most essential, at times the most insistent, and always one of the least limitable of the powers of government": 6 Ruling Case Law, section 182; District of Columbia v. Brooke, 214 U. S. 138; Noble State Bank v. Haskell, 219 U. S. 104; Eubank v. Richmond, 226 U. S. 137. "The police power is an attribute of sovereignty and exists without any reservation in the Constitution, being founded on the duty of the State to protect its citizens and provide for the safety and good order of society. It corresponds to the right of self-preservation in the individual, and is an essential element in all orderly governments, because necessary to the proper maintenance of the government and the general welfare of the community. On it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property. And it has been said to be the very foundation on which our social system rests. It has for its object the improvement of social and economic conditions affecting the community at large and collectively with a view of bringing about 'the greatest good of the greatest number' ": 12 Corpus Juris 907, section 415.

In the Scranton Case, we further said: "When the City of Scranton gave its consent to the construction of what is now the Scranton railway, it exercised a constitutional power conferred upon it, but it is conclusively presumed to have known at the time the consenting ordinance was passed that the sovereign police power of the

State to modify its terms would be supreme whenever the general well-being of the public so required. In exercising the power given it by section 9 of article XVII of the Constitution, the city did so with section 3 of article XVI before it, giving it distinct notice that the police power of the commonwealth was, and would be, controlling. With this knowledge on the part of the municipality at the time it passed the ordinance, it is not now to be heard to complain that the State has struck down its contract or agreement with the street passenger railway company. The State has done nothing of the sort, but has merely enforced a condition written by the law into the ordinance at the time of its passage, that it would at all times be subject to the police power of the Commonwealth."

If one of the constitutional provisions must yield, that conferring power on the municipality must give way to that fixing sovereignty in the State. It never could have been intended, when the Constitution was framed and adopted, that the municipalities, creatures of the State, should have powers hamstringing it when it set out to exercise sovereignty. It was pointed out in the Scranton Case, that, in the prior case of Allegheny v. Millville, etc., St. Ry. Co., 159 Pa. 411, which held a street railway company cannot avail itself of consent given to it by a municipality to construct its railway, if it fails to perform the condition upon which the consent was given, that the question there "was solely between the City of Allegheny and the railway company; the Commonwealth was not a party to it." In the case now before us, as in the Scranton Case, the Commonwealth acting through the agency created by it to speak in the public interest, the Public Service Commission, is the moving party in the litigation. Fares, facilities and service of public utilities are so intertwined that that which acts as a clog on one of them must affect the others. If a municipality cannot, in a consent-ordinance, fix the rate of fare, so as in the opinion of the State to interfere with

the "well-being of the State," as we said it could not, and if the State, armed with the police power, can strike down a fare-fixing consent-ordinance, I fail to see why, in the exercise of the same power, the State may not strike down other conditions in such an ordinance,—the paving requirement in the one under consideration,—the effect of which is, to devote revenues of the company which should go to the reduction of fares, or the betterment of facilities or service, not to the advantage of the travelling public, but of those property owners who front the highway.

The fact, stressed in the majority opinion, that the Public Service Company Act grants no special authority to the commission to make an order varying the terms of a consent-ordinance such as the one in question, makes no difference, as I view the situation, if the exactions, loaded by the municipality, the State's agent, on the company, are bound to be reflected in higher fares or lowered service, as the testimony establishes and the commission finds they will be.

If the State's police power is palsied by the municipal ordinance in the case in hand, it would be equally so, where such an ordinance, because of changed conditions and additional cost of paving, should deny the right of the utility to operate at all, because it could not meet the exaction and live. If the police power cannot relieve against such a situation for "the general well-being of the State" as determined by the agency created to guard and protect that general well-being and to declare the State's public policy (Fogelsville etc. Co. v. Penna. etc. Co., 271 Pa. 237), then the State's police power is not supreme and one of its creations outmasters it in potency. In the Scranton Case, we expressly said "a municipality may not annex such terms to its consent as will deprive the Commonwealth of its inherent police power to see that a street passenger railway company is not prevented from serving the public by the municipality's enforcement of conditions in a consenting ordinance that have

become impossible of performance......When such situation arises, as it has arisen and will arise again, there must be relief somewhere to the public, and it lies in the police power of the State, which is never to be abridged nor bartered away." This forceful statement of principle by former Chief Justice BROWN should in my opinion rule the case now before us. We are not dealing with a contract between the traction company and a private individual, such as for the purchase of cars or the like, which could not be abrogated because of the inhibition of the federal Constitution, but a contract made with an agent of the State, which certainly is within the State's control when it exercises its sovereign police power. So viewing the important question submitted to us for decision, I would hold that the Public Service Commission has power to relieve the street railway company from the paving burdens placed upon it by the ordinance, and therefore, feel compelled to express my dissent from the conclusion of the majority of the court.