Philadelphia Electric Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued December 14, 1982, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, CRAIG and DOYLE.

*Robert H. Young*, with him *Walter R. Hall, II, Michael G. Nearing* and *John B. Wright, Morgan, Lewis & Bockius*, of counsel: *Edward G. Bauer, Jr.*, and *Irene A. McKenna*, for petitioner.

*Charles F. Hoffman*, Chief Counsel, with him *Daniel P. Delaney*, Deputy Chief Counsel, and *Louis G. Cocheres*, Assistant Counsel, for respondent.

*Walter W. Cohen*, Consumer Advocate, with him *Martha W. Bush, Irwin A. Popowsky, David Wersan*, and *Robert P. Haynes, III*, Assistant Consumer Advocates, for intervenor, Consumer Advocate.

*Bernard N. Katz*, with him *Michael N. Katz, Meranze, Katz, Spear & Wilderman*, for Amicus Curiae, Building and Construction Trades Council of Philadelphia and Vicinity.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., January 27, 1983:

The Philadelphia Electric Company (PECO or Company) appeals an August 27, 1982 order of the Public Utility Commission (PUC or Commission) which in part required PECO to notify the Commission of the Company's decision either to suspend or cancel construction at the Limerick Unit 2 Nuclear Generating Plant. This Opinion is in support of the

Per Curiam Order of this Court, dated December 16, 1982, which reversed those portions of the appealed order.[1]

## PROCEDURAL HISTORY

In August 1980, the Pennsylvania Consumer Advocate filed[2] a petition requesting the PUC to investigate the need for and the fiscal wisdom of the construction of the Limerick Nuclear Generating Station.[3] By its

---

[1] The second portion of the PUC order on appeal provided:

IT IS ORDERED:

. . . .

2. That the Philadelphia Electric Company pursue an aggressive conservation program designed to substantially offset the suspension or cancellation of Limerick Unit 2 in consultation with our Bureau of Conservation, Economics and Energy Planning. The Company shall submit an initial conservation program plan within 120 days of the entry of this Opinion and Order.

We need not address paragraph two of the order since the conservation plan would not be implemented unless Limerick Unit 2 were suspended or cancelled. Since we rule today, as discussed in the text of this Opinion, that the PUC is without the authority to order such suspension or cancellation, any discussion of a conservation plan or the Commission's authority to require one is unnecessary.

[2] The Consumer Advocate is empowered by law to represent the interests of the consumer before the Public Utility Commission. Section 902-A of the Administrative Code, Act of April 9, 1929, P.L. 177, *as amended*, added by Section 1 of the Act of July 9, 1976, P.L. 903, 71 P.S. §309-2(a).

[3] As a result of a projected need for additional generating capacity, PECO's management in 1968 approved the construction of the Limerick Nuclear Generating Station. A contract was awarded to Bechtel Corporation in 1969 to design and build the Station. PECO gave formal capital authorization for the construction of two units (Units 1 and 2) in 1971. The units were initially scheduled for completion in 1975 and 1977, respectively, but, due to various delays, construction did not begin until mid-1974. Further construction delays and a company decision to match the growth in capacity additions with a lower load forecast resulted in PECO's rescheduling Unit 1 to commence operation in 1985 and Unit 2 in 1987.

order entered October 10, 1980, the Commission initiated a fact finding investigation and, at its conclusion, following eleven months of explorative discovery and hearings,[4] Administrative Law Judge JOSEPH J. KLOVEKORN (ALJ) issued his Initial Decision,[5] reporting that:

> After reviewing the extensive record in this proceeding, I can come to but one conclusion— that at the present time there is no alternative available that can replace Limerick at a lower cost to the consumer. The record shows that the timely completion of Limerick Units I and II is in the best interest of PECO and its ratepayers. Since the generation produced at Limerick will replace expensive oil-fired generation either produced by the company itself or purchased from the PJM system, these plants must be brought on line as soon as possible.
>
> It is essential, therefore, that this project be completed as close to the 1985/1987 projected commercial operation dates as possible, and as close to the company's projected costs as possible. . . .

All parties filed exceptions to his Initial Decision. The PUC resolved these exceptions in its August 27, 1982 order, rejecting, in part, the ALJ's recommendations. The order, in pertinent part, provides:

> IT IS ORDERED:
>
> 1. That the Philadelphia Electric Company inform us of its decision to suspend or cancel

---

[4] Hearings began in Philadelphia on March 24, 1981, and concluded on November 13, 1981. The hearings included 38 days of evidentiary hearings and three non-evidentiary days. Over thirty witnesses appeared, producing a record of more than 4,000 pages. Additionally, over 1,200 discovery requests were made by the parties.

[5] Limerick Nuclear Generating Station Investigation, PUC Docket I-80100341.

construction at Limerick Unit 2, in light of the conclusions of this Opinion and Order, within 120 days of the entry of this Opinion and Order and provide an explanation thereof.

Those conclusions include, *inter alia:* (1) PECO's financial instability;[6] (2) prospective unfair and unreasonable rate increases and (3) deterioration of future service resulting from inadequate funding.

PECO, upon filing in this Court a Petition for Review requesting the August 27th order to be set aside, simultaneously petitioned the PUC for an Order of Stay or Supersedeas. The Commission denied the supersedeas. We, by Opinion and Order dated October 26, 1982,[7] granted the company's application for a supersedeas. On November 8, 1982, by Order, the Supreme Court vacated the supersedeas.[8]

---

[6] The Commission's conclusion that PECO is financially unstable is based, in part, on (1) its refusal to permit PECO to include the cost of construction work in progress (CWIP) for Limerick in the determination of its then-present rate structure; (2) the "resultant probability that the Company's bond rating will not improve above its present BBB [Standard and Poors Ratings] and may in fact slide further;" and (3) the "exorbitant cost of capital" required to finance construction of both units. PUC order of August 27, 1982 at 24.

[7] *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* (No. 2365 C.D. 1982, filed October 26, 1982).

[8] The Supreme Court's Order read:

    AND NOW, this 8th day of November, 1982, it being clear from the opinion accompanying the order of the Pennsylvania Public Utility Commission dated October 15, 1982, denying a stay of its order of August 27, 1982, that the order of August 27 does not prohibit construction at Limerick Unit 2, the stay entered by the Commonwealth Court on October 26, 1982, is vacated, the order entered by the Commission on October 15, 1982, denying a stay is reinstated, and the matter is remanded for expedited consideration.

*Pennsylvania Public Utility Commission and Office of Consumer Advocate v. Philadelphia Electric Co.,* Pa. , A.2d (Nos. 129 & 130 E.D. Misc. Docket 1982, filed November 8, 1982).

## DISCUSSION AND THE LAW

This Court is mindful of both the controversial nature of the nuclear energy question and the penchant for articulation of the subject. Although the issue before us is not presented in the posture of political or moral dichotomy, we are neither unduly naive of nor oblivious to its potential for aggrandizement. But we are ever mindful of our circumscribed duty to *interpret* the will of the people as expressed by our legislature and to avoid our creating or sanctioning the creation of its will by administrative regulations.

PECO contends, among other things, that the PUC was without either the express or implied statutory authority to order the Company to cease or suspend construction on Limerick Unit 2. This is the sole determinative issue presented for our consideration and is a case of first impression in this Commonwealth.

Once again, we are called upon to examine the expanse and limitations of the PUC's authority. The Commission is a unique creation of government conceived in the proposition that public utilities in our Commonwealth are monopolistic public corporations owned by individuals and operated for profit; but the public utilities are necessarily tempered in their objectives by the common interest so that all citizens receive adequate service at fair and reasonable rates. Free enterprise is the prime distinguishing characteristic of the capitalistic system upon which our republic is founded and has thrived. History teaches us, however, that free commercial exercise in this unique area of public service must be bridled and restrained by a *responsible* arm of government, whose muscle is flexed in direct proportion to the stimulus supplied by expressed authority of the legislative organ of government. In our view, unfettered regulation is as self-destructive as unfettered laissez faire.

The Courts in this Commonwealth have, in varying instances, reviewed the Commission's decisions and have found excesses imposed by its mistaken notion of its legislative mandate. *See Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 533, 538, 311 A.2d 370, 373 (1973); *Pennsylvania Railroad Co. v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 587, 146 A.2d 360 (1958); *Pittsburgh v. Pennsylvania Public Utility Commission,* 157 Pa. Superior Ct. 593, 43 A.2d 348 (1945). When our Courts have found a want of power and authority, this holding invariably has been bedrocked on the principle that, absent expressed authority, there is no authority to support a commission's order. *N.A.A.C.P. v. Pennsylvania Public Utility Commission,* 5 Pa. Commonwealth Ct. 312, 290 A.2d 704 (1972).

"If the commission were allowed to exercise authority not conferred on it, either in specific words or as necessarily comprehended in some other power expressly granted . . . all the contracts and the general management of the business of the public utilities of Pennsylvania might, in course of time, be subjected to the control of that body, although no such condition of affairs is contemplated by the act. In other words, the evil effects of not adhering to the rule, that the authority of all extra-judicial bodies must clearly appear, soon would reach beyond the confines of this controversy and might invade the whole field of public control. The only safe and proper roads for administrative bodies like the present commission to travel are those plainly marked by the acts of assembly defining their duties, and to these the courts must confine them, if the system represented by such commissions—to which our body

politic seems committed—is to work out as intended by its creators, the legislature.

". . . [B]ut it is for the legislature (and not the courts or the Public Service Commission) to declare the public policy of the state in this regard . . . and, when it sees fit to designate the instruments to carry out its declarations, neither the courts nor the commission possess the right to expand or abridge a declaration or grant of power so made."

*Id.* at 320, 290 A.2d at 708-09 (quoting *Swarthmore Borough v. Public Service Commission,* 277 Pa. 472, 478-79, 121 A. 488, 489-90 (1923)).

Today we, in this action, again subscribe to this philosophy and pronounce it to be the law of this case and hold that the Commission lacked the authority to intrude upon PECO's managerial decision to continue with the construction of Limerick Unit 2.

The legislature, in enacting the Public Utility Code[9] conveyed broad grants of regulatory and supervisory powers to the PUC.[10] In addition, that authority has been extended in certain circumstances to examine the operation, condition and management of a utility whenever it deems it necessary to the performance of the Commission's duties.[11]

---

[9] 66 Pa. C. S. §§101-3315.

[10] 66 Pa. C. S. §501(b) provides:

Administrative authority and regulations.—The commission shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The commission may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties.

[11] 66 Pa. C. S. §331.

(a) General rule.—The commission may, on its own motion and whenever it may be necessary in the performance

432

Although the PUC has already conceded[12] that the decision to cease construction of Unit 2 is within the managerial prerogative of PECO, thus acknowledging that it lacks the expressed authority to mandate such a choice, it now argues that it may issue such an order in the public interest if it determines that PECO has "abused its managerial discretion." It claims to derive this nebulous power from decisional law, *e.g.*, *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 62 Pa. Commonwealth Ct. 460, 437 A.2d 76 (1981). The Commission misreads its authority in attempting to remedy PECO's alleged abuse of discretion. Traditionally, and properly so, the PUC has protected the public from abuses of managerial discretion by exercising its ratemaking powers.[13] When an abuse has been found, our Courts have agreed that a utility's "customers are not required to reimburse the utility through rate changes, for expenditures imprudently made." *Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 295, 433 A.2d 610, 615 (1981). Never has our Supreme Court, nor this Court for that matter, countenanced the extension of this remedial power to thwart utility construction by a review of the ex-

---

of its duties, investigate and examine the condition and management of any public utility or any other person or corporation subject to this part. In conducting the investigations the commission may proceed, either with or without a hearing, as it may deem best, but it shall make no order without affording the parties affected thereby a hearing. Any investigation, inquiry or hearing which the commission has power to undertake or hold shall be conducted pursuant to the provisions of this chapter.

[12] In its October 15, 1982 order denying PECO's request for a supersedeas, the PUC stated: "The decision to cease construction is appropriately in the hands of PECO management."

[13] 66 Pa. C. S. §1301.

ercise of discretion in daily, in-house managerial decisions.[14]

Our law gives to the PUC severely limited powers in reviewing a utility's internal management decisions. The Commission has not been given power to exercise such limited review whenever it so chooses. Accordingly, this Court cannot acquiesce in the Commission's exercise of powers when such powers have not been provided by the legislature. This conclusion is buttressed by our Supreme Court, which has held that the PUC, in non-ratemaking cases, is without authority to disapprove "the expansion or extension" of existing facilities. In so doing, it reasons "that such a decision is in the discretion of company management." *Duquesne Light Co. v. Upper St. Clair Township,* 377 Pa. 323, 337, 105 A.2d 287, 293 (1954); *Lower Chichester Township v. Pennsylvania Public Utility Commission,* 180 Pa. Superior Ct. 503, 119 A.2d 674 (1956).

Recognizing, as we do, that it is without the expressed authority to order directly the cessation or suspension of the construction of Unit 2, the PUC alternatively relies on §1903(a) of the Code for implied authority.

Section 1903(a) of the Code provides in pertinent part:

(a) General Rule.—Upon the submission or completion of any securities certificate . . . the commission shall register the same if it shall find that the issuance or assumption of the securities in the amount, of the character, and for the purpose therein proposed, is necessary or proper for the present and probable future capital needs of the public utiilty . . . otherwise it shall reject the securities certificate. The com-

---

[14] We will not here delineate the narrow parameters encompassing an abuse of managerial discretion.

mission may consider the relation which the amount of each class of securities issued by such public utility bears to the amount of other such classes, the nature of the business of such public utility, its credit and prospects, and other relevant matters. . . .

The Commission, by here attempting to enforce its order by prospectively denying the right to issue securities certificates to PECO,[15] attempts to do indirectly what it cannot do directly, i.e., suspend or cancel the construction of Unit 2.

In a similar factual situation where the Oklahoma Corporation Commission[16] attempted to disapprove a securities issuance intended to finance a nuclear power plant because the Corporation Commission was unconvinced of the need for the plant, the Oklahoma Supreme Court rejected that order, holding that "the Commission does not have the statutory authority to

---

[15] In its August 27th order and opinion, the PUC stated: Section 1903 of the Code, 66 Pa. C. S. §1903, requires this Commission to register a securities certificate if we find the issuance of the securities proposed therein is necessary or proper for the present and probable future capital needs of the public utility filing the certificate. Based on the record established in this proceeding, which we believe reflects the present and possible future capital needs of PECO in regard to the simultaneous construction of Units 1 and 2, we declare that at this time the approval of new securities issuances to finance construction of Unit 2 would be neither necessary, proper, nor in the public interest. Therefore, no new securities issuances should be approved to finance Unit 2. . . .

We note that this prospective rejection of securities certificates is clearly not provided for in §1903 of the Code. A rejection may only occur "[u]pon the submission or completion of any securities certificate." 66 Pa. C. S. §1903(a).

[16] The Corporation Commission of the State of Oklahoma is the state regulatory agency akin to the Pennsylvania Public Utility Commission.

refuse the issuance of securities based on a requirement to demonstrate the necessity or need of the underlying purpose. . . ." *Public Service Co. of Oklahoma v. State,* 645 P.2d 465, 466 (Okla. 1982).

The Oklahoma statute,[17] upon which the Commission relied, provides that:

A public utility . . . may, when authorized by order of the Commission . . . issue securities when necessary for the acquisition of property, the construction, extension or improvement of its services, or for the discharge or lawful refunding of its obligations, or reimbursement of money actually expended from income from any source, or for any other corporate purpose authorized by the commission.

The Commission then contended that the appropriate interpretation of the term "necessary" empowered it to inquire into the necessity of the underlying purpose of the issue. That Court disagreed, reasoning that:

Had the Legislature intended the Commission's interpretation it would have drafted the statute to read, *"issue securities for the necessary acquisition of property . . ."* or words of like import. (Emphasis in original.)

*Id.* at 467. Instead, that Court held that the utility securities issue need merely be deemed necessary to accomplish its project, with no evaluation of the underlying purpose required by the public service commission.

Section 1903(a) of our Code[18] requires that "the issuance . . . of securities . . . [be] necessary or proper for the present or probable future capital needs of the public utility. . . ." We agree with the Oklahoma Su-

---

[17] Okla. Stat. tit. 17, §184 (1982).

[18] 66 Pa. C. S. §1903(a).

preme Court in *Public Services Co.* and hold that the PUC may merely inquire into the necessity of the *securities issue* in the amount, character and purpose proposed; it may not inquire into the necessity of the project it purports to support.

The Oklahoma Supreme Court also held, as we do today, that:

> The ... Commission does not have the power to regulate, supervise or control the internal management of a public utility to the extent that it could prohibit the construction of the proposed project by the power company even though it was alleged that the power company's project was not necessary for it to supply electricity to its customers.

*Public Service Co.* at 466 (citing *O.G. & E. v. Corporation Commission of Oklahoma,* 543 P.2d 546 (Okla. 1975)).

In Michigan, the Public Service Commission refused to inquire into the reasonableness of a nuclear power plant in considering the financing proposal for the plant's continued construction. The state attorney general and a citizens' group challenged the Commission's refusal to examine the reasonableness of the project. The Michigan Supreme Court held that

> in a proceeding under the utility securities act, the inquiry is limited to whether there is a need to issue securities to obtain funds for a lawful purpose of the utility and does not extend to whether, to accomplish that purpose, there is need for the project to which the funds will be devoted. *The inquiry is whether funds are required to construct the project—the need for funds, not the need for the project.* (Emphasis added.)

*Kelley v. Michigan Public Service Commission,* 412 Mich. 385,   , 316 N.W. 2d 187, 190 (1982). In reach-

ing its conclusions, that Court relied on these facts:
(1) the Michigan statute[19] does not empower the Commission to approve situs and/or construction of new plants, *Id.* at , 316 N.W. 2d at 193;[20] (2) the Commission's approval of securities does not create a presumption that the plant's cost or the property purchase price will be included in the utility's rate base. *Id.* at , 316 N.W. 2d at 197; and (3) the authority to examine the purpose of the securities issue does not include a determination of the merits of the underlying project, but is limited to a determination of whether the securities are being issued for a lawful corporate objective. *Id.* at , 316 N.W. 2d at 192. Similarly: (1) the Pennsylvania statutory authority does not empower the PUC to approve the siting and/or the construction of new plants; (2) the PUC is not obligated to include the proceeds in the utility rate base; (3) and Section 1903 merely empowers the PUC to simply establish the issue need.

Our Courts have held that the PUC may not sit as a super board of directors, *Bell Telephone Co. v. Driscoll*, 343 Pa. 109, 118, 21 A.2d 912, 916 (1941); *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 62 Pa. Commonwealth Ct. 460, 466, 437 A.2d 76, 80 (1981), second-guessing ordinary business management decisions; to hold otherwise would be to ignore the wisdom of the parameters of government influence and control which have been imposed by longstanding tradition and statutory authority.

---

[19] Mich. Comp. Laws §460.301 (1982).

[20] The specific grant of the power to oversee the construction and siting of power plants was proposed in our General Assembly but never enacted. *See* S.B. 781, Printer's No. 1921 (1977); H.B. 42, Printer's No. 44 (1979); H.B. 2154, Printer's No. 2755 (1978). This grant of such a specific power, however, seems to be the trend in other states, *i.e.*, New York, Massachusetts, Wisconsin and Alabama.

438

PER CURIAM ORDER

Now, December 15, 1982, the Order of the Pennsylvania Public Utility Commission dated August 27, 1982, is reversed. An opinion will follow.

Judge ROGERS concurs in the result only.