501 Pa. 153 (1983)
460 A.2d 734
PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant,
v.
PHILADELPHIA ELECTRIC COMPANY, Appellee,
and
Office of Consumer Advocate, Intervenor.
Walter W. COHEN, Consumer Advocate, Appellant,
v.
PHILADELPHIA ELECTRIC COMPANY and Pennsylvania Public Utility Commission, Appellees.
Supreme Court of Pennsylvania.
Argued April 26, 1983.
Decided May 27, 1983.
*154 *155 *156 Louis G. Cocheres, Ass't Counsel, Charles F. Hoffman, Chief Counsel and Daniel P. Delaney, Deputy Chief Counsel, for Pennsylvania Public Utility Com'n.
Walter W. Cohen, Consumer Advocate.
Irwin A. Popowsky, Asst. Consumer Advocate.
Walter R. Hall, II and Robert H. Young, for Philadelphia Elec. Co.
Edward J. Riehl, for PAIEUG.
Mark B. Segal, for CEPA, et al.
Jackie Ruttenberg, for Keystone Alliance.
Andre S. Dasent, Dept. City Sol., for City of Philadelphia.
Before ROBERTS, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

OPINION OF THE COURT
FLAHERTY, Justice.
This is an appeal from an order of the Commonwealth Court[1] which reversed an adjudication of the Pennsylvania Public Utility Commission ("PUC") which declared that it would refuse to approve additional securities proposed to be issued by the Philadelphia Electric Company ("PECO") in conjunction with construction of the Limerick 2 nuclear power plant.
In August, 1980, the Pennsylvania Consumer Advocate, as representative of consumer interests before the PUC,[2] petitioned the PUC for an investigation of the need for and fiscal wisdom of constructing the Limerick Nuclear Generating Station, consisting of two units, Limerick 1 and Limerick 2, scheduled for completion in 1985 and 1987 respectively. The PUC initiated an investigation, and, following extensive discovery and hearings, the presiding administrative law *157 judge determined that completion of both Limerick units was in the best interest of ratepayers, as well as of PECO. Exceptions to this finding were filed, following which the PUC rejected, in part, the administrative law judge's decision and issued a declaratory order[3] that if PECO did not suspend or cancel construction of Limerick 2 the PUC would not register, pending completion of Limerick 1, any new securities issuances[4], the proceeds of which would be used, in whole or in part, for construction of Limerick 2.
This order reflected the PUC's conclusion that completion of Limerick 2 is not financially feasible[5] due in part to the PUC's unwillingness to provide rate increases of such magnitude as would be required to support construction of that project, whereas the combined cost to completion of both Limerick units would range from five to six billion dollars. The PUC further concluded that exorbitant funding burdens of Limerick 2 would incur risk of deterioration in future service, as well as endanger the timely completion of Limerick 1, due to PECO's already grossly substandard financial condition, associated with an existing bond quality rating of just BBB (Standard and Poors' lowest investment grade) that would predictably decline to a speculative rating *158 upon issuance of securities to fund Limerick 2. Such a decline, the PUC reasoned, would in all likelihood preclude PECO's access to financial markets altogether.
The primary issue presented is whether the PUC can properly withhold approval of securities necessary to the financing of Limerick 2. The PUC's authority over approval of such securities is set forth in Section 1903(a) of the Public Utility Code, which provides, in pertinent part, as follows:
§ 1903. Registration or rejection of securities certificates
(a) General rule.  Upon the submission or completion of any securities certificate . . . the commission shall register the same if it shall find that the issuance or assumption of securities in the amount, of the character, and for the purpose therein proposed, is necessary or proper for the present and probable future capital needs of the public utility filing such securities certificate; otherwise it shall reject the securities certificate. The commission may consider the relation which the amount of each class of securities issued by such public utility bears to the amount of other such classes, the nature of the business of such public utility, its credit and prospects, and other relevant matters.
Act of July 1, 1978, P.L. 598, No. 116, § 1, 66 Pa.C.S.A. § 1903(a) (1979) (emphasis added). It is claimed that the PUC has too far intruded upon PECO management's realm of exclusive discretion by determining that the power plant in question is not requisite to the company's capital needs. While the statute expressly delegates to the PUC authority to determine whether proposed securities are "necessary or proper" to meet those needs, PECO claims that management, not the PUC, must determine capital needs, and that the PUC is constrained to take management's stated needs as a given, and then inquire only as to whether the securities are necessary to finance those needs. The PUC, however, asserts that the statute confers authority to reject management's opinion as to capital needs, in the limited realm where securities issuance is required in order to finance those needs.
*159 It is well established that, absent express legislative authority, the PUC is powerless to interfere with the general management decisions of public utility companies. Swarthmore Borough v. Public Service Commission, 277 Pa. 472, 478, 121 A. 488, 489-490 (1923). The Public Utility Code does not expressly grant the PUC general authority over the siting and construction of all utility plants. Nor does it require PUC approval for expansion of all facilities, the discretion of the company's management over such matters being generally beyond the PUC's power to supersede. Duquesne Light Co. v. Upper St. Clair Township, 377 Pa. 323, 337, 105 A.2d 287, 293 (1954). Even the PUC concedes that it is without power to order that construction of Limerick 2 be ceased, an order which the PUC did not issue here. PECO contends that, through the refusal to approve securities funding the project, the PUC is attempting to exert indirectly a power that has not been bestowed directly or by necessary implication. Delaware River Joint Toll Bridge Commission v. Carver, 399 Pa. 545, 550, 160 A.2d 425, 428 (1960). We disagree, and, for the reasons that follow, believe the PUC's action to be directly authorized by the securities registration provision of the Public Utility Code.
Abuses of managerial discretion may be buffered against consumer impact through exercise of the PUC's rate-setting powers, disallowing rate increases which would reimburse utilities for expenditures imprudently made. E.g., Park Towne v. Pennsylvania Public Utility Commission, 61 Pa.Commw. 285, 295-297, 433 A.2d 610, 615-617 (1981). Nevertheless, due to the unique character of public utilities, as, in effect, governmentally licensed monopolies, imprudent management decisions may occur that are not shielded from public impact through free market competition, or even through the traditional rate-setting mechanism. Indeed, the PUC, in issuing the subject order, concluded that if construction of Limerick 2 were to proceed the probable delays and cost overruns would likely result in the ultimate cost of the plant being excessive, and, hence, result in *160 unreasonably high rate charges if the plant's cost were to be included in rates.
The PUC has general administrative power and authority to supervise and regulate all public utilities, pursuant to the powers and duties with which it is charged, 66 Pa.C.S.A. § 501(b). It is responsible not only for assuring just and reasonable rates, 66 Pa.C.S.A. § 1301, but for overseeing maintenance of adequate, efficient, and continuous utility service, 66 Pa.C.S. § 1501. Maintenance of that service cannot be achieved without preservation of the utility itself, and circumstances may arise where it is desirable to hinder a utility from falling victim to imprudent capital spending programs which are of such great magnitude as to imperil the company's continued viability.
Routine day-to-day management decisions, which bear lesser risk to the utility as an ongoing concern, and which do not portend such ultimate danger of burdening the public with large rate increases to rescue the utility from extinction, or of impeding the utility's ability to raise capital through securities offerings, have traditionally been beyond the ambit of the PUC's control. Nevertheless, we believe the legislature intended, through the foregoing securities provision, to enable the PUC to intercede with respect to management's capital spending programs when these are of such great size as to require special securities financing. These programs, having extraordinary potential for determining the course of rates and service, are not mere daily management matters reserved for corporate autonomy. Such programs inevitably affect the utility's "credit and prospects," these factors being expressly set forth in the statute as entering into the judgment as to whether a securities issuance is "necessary or proper" for the capital needs of the company. The interpretation urged by PECO, however, would effectively limit the PUC's inquiry to a determination of whether such securities were "necessary or proper" to fund the capital improvement plans of the company, thereby foreclosing scrutiny of the underlying needs. We believe such an interpretation would too narrowly define *161 the PUC's authority[6], in view of the probable legislative intent to shield the public from the effects of management's unchecked discretion in the limited realm of capital spending projects that are so large in relation to the company's internal funds as not to be sustainable without external financing. While this is a severe intrusion upon matters that, in an unfettered, competitive, free enterprise economy, would normally be within management's dominion, public utilities are not models of competitive behavior, and, as monopolies, have been subjected to a uniquely comprehensive regulatory scheme. Accordingly, the PUC has authority under the securities registration statute to disapprove the proposed issuance of securities, based upon PECO's credit and prospects. The action of the PUC is consistent with the regulatory power which has been vested in it by the legislature[7].
Order reversed.
*162 LARSEN and ZAPPALA, JJ., concur in the result.
NIX, J., did not participate in the consideration or decision of this case.
NOTES
[1] Philadelphia Electric Co. v. Pennsylvania Public Utility Commission, 71 Pa.Commw. 424, 455 A.2d 1244 (1983).
[2] See 71 P.S. § 309-2.
[3] Pursuant to 66 Pa.C.S.A. § 331(f), which provides for issuance of declaratory orders.
[4] Securities of public utilities must be registered with the PUC prior to issuance. 66 Pa.C.S.A. § 1901(a).
[5] We find that the record amply supports the PUC's determination, the finding of financial infeasibility being supported by substantial evidence. See 2 Pa.C.S.A. § 704 (substantial evidence required). Further, PECO's challenge to the sufficiency of the record, based upon the fact that the PUC relied upon evidence not appearing in the record bearing the instant case number, is without merit. Although some of the evidence relied upon appears in the record of what is, in form, another case, to wit PECO's rate determination case bearing a different number, that case involved the same major parties as well as the same administrative law judge and the same counsel. The record of the rate case evolved concurrently with that of the Limerick case, and the substantial similarity and interrelationship of issues in the two cases was expressed, in the rate case record, by PECO's counsel. Under these circumstances, elevation of form above substance so as to distinguish between the two records would be unwarranted.
[6] But see Public Service Co. of Oklahoma v. State, 645 P.2d 465 (Okl.1982); Kelly v. Michigan Public Service Commission, 412 Mich. 385, 316 N.W.2d 187 (1982); Appeal of Public Service Company of New Hampshire, 454 A.2d 435 (N.H.1982).
[7] Other issues raised in the instant appeal are not presently reviewable. As part of its order declaring the unavailability of registration for securities to finance the construction of Limerick 2, the PUC directed that, if construction of that facility is suspended or cancelled, PECO must file an energy conservation plan designed to avert the need to install other additional capacity, thereby offsetting the relinquished generating capacity of Limerick 2. The need to review the scope of PUC authority to require such a conservation plan is negated by PECO's having taken the position that it has no objection to filing the requested plan.

Further, the opinion accompanying the PUC's order contained criticism, of an advisory nature, directed at PECO's decision in 1976 and 1978 to defer completion of the Limerick facilities. Such mere criticism, however, does not constitute an adjudication and cannot be reviewed on appeal.
Similarly, the opinion included a statement of the PUC's intention to deny, in any subsequent rate case, compensation to PECO for any funds thereafter used to continue construction of Limerick 2, such compensation being known as the Allowance for Funds Used During Construction ("AFUDC"). This statement of intention is likewise not an adjudication, and the AFUDC issue is, thus, not ripe for review.