521 A.2d 482

David M. Barasch, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Consumers Education and Protective Association (CEPA), Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Argued September 10, 1986, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Irwin A. Popowsky,* with him, *Susan Perkins Weston,* and *Scott J. Rubin,* Assistant Consumer Advocates, and *David M. Barasch,* Consumer Advocate, for petitioner, David M. Barasch, Consumer Advocate.

*Steven P. Hershey,* for appellant, Consumers Education and Protective Association (CEPA).

*Daniel P. Delaney,* Deputy Chief Counsel, with him, *Veronica A. Smith* and *Louis G. Cocheres,* Assistant Counsels, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Robert H. Young,* with him, *William, E. Zeiter, Jay H. Calvert, Jr., Donald F. Clarke* and *Paul H. Zoubek; Morgan, Lewis & Bockius;* Of Counsel: *Edward G. Bauer, Jr.,* Vice President and General Counsel, for intervenor, Philadelphia Electric Company.

*Roger E. Clark,* Chief Counsel, for intervenor, Governor's Energy Council.

OPINION BY JUDGE BARRY, February 18, 1987:

This appeal results from an order of the Pennsylvania Public Utility Commission (PUC or Commission) which granted certain exceptions of Philadelphia Electric Company (PECO) filed with respect to the recommended opinion of Administrative Law Judge ALLISON TURNER (the ALJ). The granting of the exceptions had the practical effect of permitting PECO to complete construction of Limerick Unit No. 2, a nuclear-powered electric generating station.

The PUC order involved declared specifically that "unconditioned completion of construction of Limerick Unit No. 2 is not in the public interest," but adjured further that PECO notify the Commission within thirty

days regarding "whether it accepts and agrees to be bound by the terms and conditions of [certain] cost containment plans . . . ." Those plans, compliance with which has since been agreed to by PECO, were formulated by the PUC in its opinion accompanying the order, and were articulated as prerequisites to Limerick 2 being in the public interest, and hence to the PUC's approval of continued construction of Limerick 2.

Petitioners, the Office of the Consumer Advocate (OCA); the Governor's Energy Council (GEC); and the Consumers Education and Protective Association (CEPA), have petitioned for review from the PUC order.

### 1. *Prior Related Proceedings and Origin of the Present Litigation*

The construction of the nuclear reactors at Limerick has been the subject of continuing litigation since 1979. Most notably, after concerns had been raised with respect to the wisdom of simultaneous construction of Limerick Units 1 and 2, the PUC in 1982 ordered PECO to either suspend or cancel construction of the second unit. After a challenge by PECO to the authority of the PUC to issue such an order, the Supreme Court confirmed that the PUC indeed possessed constructive power to *render* such an order by refusing to approve securities issues for the funding of the project.[1] PECO then did, in fact, suspend construction.

As completion of Unit 1 approached, concerns with respect to Unit 2 continued, and public hearings were held by the House Select Committee to Investigate Limerick 2 to assess the wisdom of completing the unit. In apparent response to this legislative concern, the

---

[1] *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 501 Pa. 153, 460 A.2d 734 (1983).

PUC on August 7, 1984, ordered PECO to show cause why the completion of Limerick 2 would be in the public interest. The order set forth four issues raised by the spectre of completion of the unit: (1) "[the] serious question [] . . . regarding the need for the additional generating capacity represented by Unit 2"; (2) "the cost effectiveness of Unit 2 as compared to other alternatives"; (3) "the effect upon PECO's financial health and its ability to provide safe and adequate service at reasonable rates"; and (4) "the potential effect of the cost burden of Unit 2 upon PECO's existing customer base." *Show Cause Order* at 2, *reproduced in PUC Decision,* No. I-840381, December 5, 1985, at 6. The Order then directed the institution of an investigation and the examination of the following specific issues:

1. Is construction of Unit 2 necessary for PECO to maintain adequate reserve margins?

2. Are there less costly alternatives—such as cogeneration, additional conservation measures, or purchasing power from neighboring utilities or the [Pennsylvania-New Jersey-Maryland] interchange—for PECO to obtain power or decrease consumption?

3. How will the capital requirements necessary to complete Unit 2 affect PECO's financial health and its ability to provide adequate service?

4. Should the Commission reject any securities filing; or impose any other appropriate remedy, to guarantee the cancellation of Unit 2?

5. If Unit 2 is cancelled, what, if any, percentage of the sunk costs should PECO be permitted to recover from its rate payers?

6. If construction of Unit 2 is found to be in the public interest, should the Commission

adopt an "Incentive/Penalty Plan" as an inducement to cost efficient and timely construction? *Show Cause Order* at 2-3, *reproduced in id.* at 6-7.

Hearings were thereupon convened before an ALJ, and twenty-three days of such hearings were held from January to April, 1985. At those hearings the foregoing issues were addressed by way of documentary and oral testimony adduced by PECO and adversary groups, some of which groups are pursuing the present appeal. After making extensive findings of fact, the ALJ concluded that "completion of Limerick 2 is not in the public interest," explaining that conclusion as follows:

> [This ALJ has been] persuaded that Limerick 2's capital and operating costs will most probably be higher than projected by PECO, and that in any event, the alternatives [to completion] presented . . . would be more economically beneficial than completion of Limerick 2. The impact of Limerick 2's capital costs alone would have a strong adverse impact on PECO's rate payers, its customer base, and its sales and revenue flows.

*ALJ Decision* at 407. The ALJ thus recommended against the approval of "any securities certificates the proceeds of which are to be used in whole or in part for Limerick 2." *Id.* at 420.

PECO thereafter filed exceptions to the decision, arguing, among other things, that completion of the unit was in fact in the public interest and that "any uncertainties concerning the costs/benefits of Unit No. 2 [could] be eliminated by a reasonable cost containment plan." *See PECO Exceptions* at 3. Such a plan had been advocated by several parties during the proceedings and had been characterized by the ALJ as a necessary ingredient of a Limerick 2 completion scenario.

After PECO had filed its exceptions and the parties had briefed the case before the PUC, the legislature en-

acted legislation which supplied the Commission with the express authority to cancel a plant. That legislation mandated that the Commission was to order cancellation when such unit was found not to be in the public interest.

## 2. *PUC Decision*

In a decision dated December 5, 1985, the PUC granted in part and denied in part PECO's exceptions. First re-assessing the evidence, the PUC found that "PECO may need additional base load capacity as early as 1992," but pointedly refrained from making any "finding as to how that need should be met." The PUC then went on to consider the alternatives to completion.[2] In this respect, the PUC concluded that "there is

---

[2] The alternatives consisted of four different methods of electric power production and/or supply. Although some of the parties performed cost analyses based upon scenarios other than these four "base cases," the following group of options constituted the centerpiece of the Commission's consideration:

*Base Case I*

Resume construction of Limerick Unit 2 upon commercial operation of Limerick I. Limerick 2 to be completed by 1990.

*Base Case II*

Abandon Limerick Unit 2 and build equivalent capacity of coal-fired generation at another site in the Company's service area.

*Base Case III*

Abandon Limerick Unit 2 and extend the life of four oil-fired units. Build Chester coal units at later date.

*Base Case IV*

Abandon Limerick Unit 2 and purchase equivalent energy from outside PJM[*] Interconnection.

*PUC Decision* at 33-34. [*Pennsylvania-New Jersey-Maryland.]

no clear *best choice* among the alternatives analyzed." *PUC Decision* at 49 (emphasis in original). Against this backdrop, the PUC (1) found that "there may be present value benefits to customers *if* Limerick Unit No. 2 were to be completed and operated under a cost containment and operating plan." *id.;* (2) went on to formulate such a plan, *id.* at 77-89; and (3) ordered that PECO notify it, the PUC, with respect to whether "it accepts and agrees to be bound by the terms and conditions of the . . . plans set forth in . . . this Opinion and Order." *Id.* at 90.

With respect to the pivotal issue addressed by both the show cause order and the new statute, the Commission concluded that "the *unconditioned* completion of construction of Limerick Unit No. 2 is not in the public interest." *Id.* (Emphasis added.) The further conclusion, however, was made that if the Company accepted the plans, completion of Limerick 2 *was* in the public interest. *Id.* at 89.

PECO accepted imposition of the cost-containment and incentive plans, and a number of intervenors (petitioners) thereupon filed petitions for review in this Court.[3] Those intervenors argue that imposition of the plans was a regulatory response inherently inconsistent with the newly-enacted Section 520 of the Public Utility Code, 66 Pa. C. S. §520, and that certain provisions of the statute were ignored. Further, intervenors argue that the PUC abused its discretion in imposing the plans, asserting specifically (1) that substantial evidence does not support the components of the plan; (2) that the plans are ineffective to satisfy their announced goals;

---

[3] PECO also filed a petition for review at No. 182 C.D. 1986, "so as to preserve on appeal certain issues which were decided against the company" before the Commission. *See Brief for PECO* at 19. That petition was, however, stayed indefinitely upon PECO's application prior to the briefing and argument of this case.

and (3) that the failure of the PUC to provide intervenors with renewed opportunity to comment on the plans constituted a denial of due process.

3. *Task of the PUC: This Court's Review of The Involved Order*

We find it necessary as a preliminary matter to establish precisely *what issue* the PUC was obliged to resolve in the proceedings presently subject to our review. Our consideration of the advocacy in this case reveals, as will be seen, an implicit lack of consensus on this point.

The original show cause order which initiated these proceedings contemplated, of course, the PUC forbidding the completion and operation of Limerick 2, were that facility not demonstrated as being in the public interest. Any doubts with respect to the direct authority of the Commission to *order* a cancellation were conclusively put to rest by the legislature which, before the PUC rendered the present order, enacted the following legislation:

> The commission shall order any public utility engaged in producing, generating, transmitting, distributing or furnishing electricity to cancel or modify the construction of, or its participation in the construction of any generating unit where the commission, after notice and an opportunity for hearing, determines that construction is not in the public interest. In addition to any other relevant matters, the commission shall consider in its determination whether:
>
> (1) The generating unit is necessary for the utility to provide adequate and reliable service to the public.
>
> (2) There are less costly alternatives by which the utility could maintain its ability to provide adequate and reliable service.
>
> . . . .

66 Pa. C. S. §520 (Section 4(b) of the Act of October 10, 1985, P.L. 257). We note, of course, that as a statutory requirement existing prior to the PUC's decision concerning the future of Limerick 2, the agency was bound by the strictures of the statute.[4]

Being bound by the foregoing statute, it devolved upon the Commission to determine whether PECO had established[5] that completion of Limerick 2 was "in the public interest," and to consider in the course of such determination whether the proposed plant was necessary for the provision of adequate and reliable service to the public, and whether less costly alternatives existed. This Court's task, consequently, is limited to determining whether any error of law was committed in the course of the determination, whether the necessary findings of fact are supported by substantial evidence, and whether any constitutional rights have been violated. 2 Pa. C. S. §704. *See U.S. Steel Corp. v. Pennsylvania Public Utility Commission,* 69 Pa. Commonwealth Ct. 134, 139, 450 A.2d 1073, 1075-76 (1982).

## A.   *The PUC's Compliance With Section 520*

As suggested in the preceding section, a basic premise of the petitioners' appeal is that the PUC misconstrued its duty under the new statute. We, however, detect no error in the approach undertaken by the Commission in discharging its new statutory duty.

---

[4] The statute indicates an immediate-effectiveness date of October 10, 1985, and was thus operative, of course, on that date. *See generally* Section 1701 of the Statutory Construction Act, 1 Pa. C. S. §1701.

[5] The Commission's determination that PECO had the burden of proof in the present case has not been challenged in this petition for review.

That approach, as detailed above,[6] involved a two-step process, contemplated in the original show cause order and comporting with the statute as well. The first step entailed a determination of whether the new unit was necessary to satisfy future electric power needs. The second step, meanwhile, proceeded logically from the first and embraced a determination of whether lesser-cost alternatives to completion of the new unit, by which that need could be met, existed.

It is at this second step, however, that the PUC is alleged to have failed to exercise its duty under the statute. Having first found that additional capacity was needed, the Commission made the finding that there was "no clear *best choice* among the alternatives analyzed," and then retreated from *ordering* PECO to undertake any of the alternatives. However, because the option of completion of the Limerick 2 unit under a *cost-containment plan* was found to be a "reasonable alternative" under these circumstances, such an undertaking was approved, on the condition, of course, that PECO agree to be bound by the plan. This action is alleged to be error for a number of reasons.

We note at the outset that the petitioners do not challenge the factual finding of a need for additional capacity.[7] That finding was, of course, necessary before the threshold into consideration of the alternatives was crossed.

---

[6] *See supra* Part 2 of this opinion.

[7] In Part IV of the Commission's Decision, *id.* at 23-32, the Commission reviewed PECO's load growth scenario and the evidence and arguments from adversary groups assailing that scenario. The Commission was of the view that weaknesses existed in PECO's forecast which suggested that "the capacity represented by Limerick Unit No. 2, while still necessary, may be needed somewhat later than PECO currently projects." *Id.* at 31. Nevertheless, the Commission went on to reject the ALJ's finding with respect to load growth and declared that "[w]e find . . . that the company may

i. *Adequacy of Findings With Respect to the Public Interest*

The most pointed criticism of this aspect of the decision comes from OCA. Echoing the PUC dissent, OCA charges that the Commission in the course of considering the alternatives failed to make the fundamental finding of how the "reasonable" alternative of a cost-contained completion makes Limerick 2 *in* the public interest. Such a finding, OCA argues, is absolutely necessary under the statute, and its omission precludes any effective "basis for review of [the PUC] determination."[8]

This argument, however, is advanced in disregard of the following declaration made after the PUC's initial determination that unconditioned completion was *not* in the public interest:

> We believe it self-evident that a properly structured cost containment program coupled with a performance maintenance plan could satisfy all or nearly all of our concerns which we have concluded render the construction of Limerick Unit No. 2, not in the public interest.
>
> . . . .
>
> In the event the Company accepts . . . the cost containment and operational incentive plans, we conclude that the completion of Limerick Unit No. 2 *is* in the public interest. . . .

*PUC Decision* at 84-85, 89. (Emphasis added.)

---

need additional capacity as early as 1992." *Id.* This was a date which dovetailed with the projected on-line date for the plant.

The foregoing finding, premised as it was on the Commission's careful review of the evidence, clearly satisfies, in our view, the statutory mandate that the Commission consider whether the facility is necessary for the provision of adequate and reliable service.

[8] *Brief for OCA* at 35.

The foregoing, in our view, adequately sets forth the basis of the Commission's conclusion: a *conditioned* Limerick 2 was found to be in the public interest by virtue of (1) its ability to satisfy the needed increased capacity; and (2) its status as a modality to meet that need at a cost comparable to the non-nuclear alternatives analyzed.[9]

ii. *Adequacy of Conclusions With Respect to the Public Interest*

In a related attack, OCA further assails the Commission for "never discussing . . . why completion of Limerick 2 *with* a cost cap was preferable to other alternatives which *are* in the public interest." *Brief for OCA* at 35 (latter emphasis added). The most direct response to this argument is that completion with a cost-containment plan *was,* as discussed above, an option among the alternatives found *to be* in the public inter-

---

[9] GEC makes the fundamental assertion that the Commission did not effectively consider the alternatives, pointing particularly to the Commission's statement that

> [w]e find that although these alternatives have merit and should be studied further in the event that Limerick Unit No. 2 is cancelled, they have not been developed to the extent which would allow a realistic cost comparison with Limerick Unit No. 2.

*PUC Decision* at 46. *See Brief for GEC* at 17. While this statement admittedly demonstrates that the Commission reached no definitive *conclusion* regarding the alternatives, the statute does not demand such finality.

Our review of the decision, further, leads to no other conclusion but that the Commission followed the admonition that it *consider* whether "[t]here are less costly alternatives. . . ." In Part V of the Decision, *see id.* at 33-47, the Commission thoroughly reviewed the various alternative scenarios to completion. These "base cases," *see supra* note 2, were considered from a cost-intensive point of view, with the Commission considering the present-value benefits of each alternative.

est. To the apparent extent that OCA argues that completion *with* a cost-containment plan was *not* found to be in the public interest, or was somehow *undefined* in terms of the public interest, OCA is simply incorrect.

. We believe, however, that this argument most likely belies a lack of consensus with respect to the PUC's obligations under the statute. OCA seems to be of the view that the PUC was obliged to determine conclusively which of the alternatives was the least-cost option—and, hence, most clearly in the public interest—and then to order PECO to undertake that course. We disagree with any such assertion.

The statute, of course, grants the PUC substantial new authority, as in the past the decision to construct new generating facilities was considered strictly a managerial function of the utility. *See Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 71 Pa. Commonwealth Ct. 424, 432, 455 A.2d 1244, 1247 (1983) ("the decision to cease construction . . . is within the managerial prerogative of PECO [and the PUC thus acknowledges] that it lacks the expressed authority to mandate such a choice. . . ."), *rev'd on related grounds,* 501 Pa. 153, 460 A.2d 734 (1983). Rather clearly, the power to cancel *directly* a proposed unit enables the Commission to impose a substantial regulatory check on decisions to construct new generating facilities.[10]

Beyond granting the PUC this new power, however, the effect of the statute is limited. While the Commission may now order the cancellation of a unit, the law

---

[10] In the Supreme Court's decision cited in the accompanying text, the Court held that the PUC could *indirectly* compel the cancellation of an electric generating unit by disapproving the proposed issuance of securities based on the utility's credit rating and prospects. *See* 501 Pa. at 158-61, 460 A.2d at 738-39 (construing Section 1903(a) of the Public Utility Code, 66 Pa. C. S. §1903(a)).

does not go so far as to compel the PUC to make PECO's management decisions for it; such decisions are still principally in the utility's hands, subject to increased regulation. For that reason, the PUC correctly apprehended its function when it declared that "our task . . . is not to determine the best course of action from the alternatives developed on the record and then to direct PECO to follow that course but, rather, only to determine whether PECO has demonstrated that completion of Limerick Unit No. 2 is in the public interest." *PUC Decision* at 30.

With these parameters recognized, this Court sees no disservice to the statute—once a determination was made that *unconditioned* completion was not in the public interest—in allowing PECO to proceed under the alternative of a cost conditioned Limerick 2 completion when such alternative was found to be in the public interest. We reject, then, any assertion that PECO had the burden of showing, and that the PUC had the duty of finding, that a conditioned completion of Limerick 2 was, conclusively, the most "preferable" alternative.[11]

---

[11] Our conclusion in this regard is bolstered by the fact that the statute does *not* direct that the least-cost alternative must *inevitably* be undertaken by the utility. We note that *other* states *have* undertaken such a regulatory approach. In Iowa, for example, the 1983 amendments to that state's utility act

> state that a certificate of public convenience and necessity for a new electric generating plant can only be issued by the . . . Commission if the Commission finds among other things, that '[t]he applicant has considered all feasible alternatives to the facility including nongeneration alternatives; has ranked these alternatives by cost; has implemented the least-cost alternatives first; and the facility in the application is necessary notwithstanding the implementation of these alternatives.'

Colton, *Utility Involvement in Energy Management: The Role of a State Power Plant Certification Statute*, 16 Envtl. L. 175, 184-185 (1986) (quoting Iowa Code Ann. §476A.6(5)) (footnote omitted). *See*

### iii. *Propriety of Cost-Containment Plan*

The PUC is also alleged in this appeal to have abused its discretion in formulating and implementing the cost-containment plans. GEC, in this respect, argues that the statute demands that, once a finding is made that completion of a unit is not in the public interest, the PUC is *obliged* to order cancellation. The PUC could *not,* GEC argues, go on to determine that *conditioned* completion *was* in the public interest and allow PECO to opt for such an undertaking.

Surely, however, if the PUC has the authority to order the *cancellation* of a plant it must also be held to possess the discretionary capability to condition completion and operation of a generating unit on the satisfaction of cost parameters which mark the fiscal boundaries of the public interest. This is an inference to be drawn from the statute itself, which we agree was intended to vest the PUC with broader powers over the previously unregulated construction of utility plants. That power, further, derives in turn from the organic administrative responsibility of the PUC to oversee maintenance of adequate, efficient, and continuing service. *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 501 Pa. at 160, 460 A.2d at 738 (citing 66 Pa. C. S. §1501). In light of this new authority and the Commission's traditional responsibilities—and because we certainly cannot read the statute as *negating* the power of the Commission to formulate and im-

---

*also* Colton, *Conservation, Cost-Containment and Full Energy Service Corporations: Iowa's New Definition of "Reasonably Adequate Service,"* 34 Drake L. Rev. 1 (1984-85). The requirements of the quoted statute impose a greater regulatory "burden" on the Iowa Commission than does Section 520 on the PUC. Section 520 leaves the Commission wide discretion in determining whether the public interest will be accommodated by the completion of a plant, and does not include a "least-cost imperative" as does the Iowa law.

plement a cost-cap—we are loath to disregard the Commission's own construction of its statutory mandate in this new regulatory endeavor. *See Chappell v. Pennsylvania Public Utility Commission*, 57 Pa. Commonwealth Ct. 17, 21, 425 A.2d 873, 875 (1981) ("[T]he construction given a statute by those charged with its execution and application is entitled to great weight and should be disregarded or overturned only for cogent reasons and if such construction is clearly erroneous.").

We conclude, then, that the Commission did not abuse its discretion in discussing and proposing to implement the cost-containment plans.

### iv.   *Cost Containment as Effective Regulatory Response*

Petitioners also argue that the cost-containment plan is *inherently* flawed as a device to ensure that Limerick 2 stays within the cost parameters determined by the PUC to be coextensive with an undertaking in the public interest. GEC, in this respect, argues that subsequent developments in federal nuclear energy regulations may increase the costs of completion and/or operation and maintenance of the plant, making it "likely that the PUC's . . . plan would be re-examined and changed, with the strong possibility that the plan's protection of the ratepayers would be further deleted or altogether scrapped." This acknowledged possibility,[12] GEC asserts, reveals imposition of the plan to be a regulatory response manifestly at odds with the statute:

> By imposing future, uncertain conditions on the completion of Limerick Unit No. 2, the Commission is in fact making a determination

---

[12] *PUC Decision* at 75 ("nuclear power has its own peculiar set of problems created by everchanging regulatory requirements, which are entirely outside the control of the utility itself."). *See Brief for GEC* at 14.

that the Unit *might* be in the public interest. This is very different from determining that the Unit *is* in the public interest. [T]he Commission must order cancellation unless it determines that completion *is* in the public interest. Any other interpretation of §520 would render it unable to protect rate payers from the costs of unneeded and uneconomic plants.

*Brief for GEC* at 15. *Cf. PUC Decision, Dissenting Opinion* at 3.

The scenario contemplated by GEC is not unrealistic; were the Nuclear Regulatory Commission to order presently unforeseen, expensive safety modifications, PECO might conceivably re-appear before the PUC and argue that the "preservation of its financial health supersedes its agreement to the cost cap."[13] Further, PECO, because bringing an issue based upon a new legal and factual matrix, would clearly not be collaterally estopped from making such an argument. *See Keystone Water Company v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 312, 320, 474 A.2d 368, 372-73 (1984) (utility could "relitigate" issue of whether investment in filtration plant could properly be included in rate base because of intervening change in law: "Collateral estoppel is designed to prevent relitigation of issues which have once been decided and have remained substantially static, factually and legally.").

However rational a scenario, the picture painted is nevertheless one which is essentially speculative, and we are not persuaded that these ruminations foretell such inevitabilities that we can declare that a cost-contained generating plant is, as a matter of law, not in

---

[13] *Brief for GEC* at 15.

the public interest.[14] Were these *not* speculations, a cost-containment plan might *be* receptive to a present analysis of its merits vis-a-vis the statutory duty of the PUC to protect the public interest; as the record exists at this point, however, to make such a determination would be premature and a substitution of our judgment for that of the Commission. Such a substitution would be unwarranted. Formulation of a cost-containment plan was a legitimate exercise of the Commission's power[15] and involves "an administrative function peculiarly within the expertise of the Commission." *See U.S. Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 211, 390 A.2d 849, 857 (1978) (*so describing PUC responsibility of establishing utility rate structures*).

### v. *Conclusion*

We thus conclude that the PUC has correctly interpreted Section 520 and applied it in a manner consistent with the factual findings in this case. Those findings are, further, satisfactorily articulated and the Commission's decision is, thus, reviewable by this Court.

### B. *Support from the Record for Cost-Contained Limerick 2 as Reasonable Alternative*

While we have concluded that the Commission acted lawfully and within its discretion in allowing PECO to opt for completing Limerick 2 under a cost-containment plan, it remains for this Court to determine whether the record supports the Commission's

---

[14] The PUC decision reveals, further, that the Commission was well aware of the inherent problem of predicting the future costs of nuclear power as it contemplated the compatability of the public interest with a cost-contained Limerick 2.

[15] *See supra* Part 3(A)(iii) of this Opinion.

finding that such option in fact *constituted* a reasonable alternative. We note, of course, that we are limited to determining whether that finding is "supported by substantial evidence; we may not substitute our judgment for that of the [PUC,] nor may we indulge in the processes of weighing evidence and resolving conflicting testimony." *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 430, 436, 490 A.2d 806, 809 (1985).

The Commission's analysis of the costs of the various alternatives involved consideration of the differential, in present value terms, of additional "revenue requirements" between the alternatives and completion of Limerick 2. "Revenue requirements" under this analysis were comprised of the projected costs of building, maintaining and operating the plant or plants which made up each base case over the period 1985-2020.

The following table distills the voluminous data produced in the course of this analysis, and was the focus of the PUC's fact-finding endeavor. The tabular entries, reproduced in pertinent part, show either the increase or decrease (numbers in parentheses)—the "differential"—of the projected revenue requirements of each alternative in comparison to Base Case I, completion of Limerick 2. *See supra* note 2. (In understanding this data as assembled in the table, OCA, for example, predicted that undertaking Base Case II would be $1,501 million cheaper than completing and operating Limerick 2):[16]

---

[16] Critical aspects of the data contained in the table were characterized by the ALJ as follows:

PECO's presentation compares the base cases on its calculation of aggregate present value (APV). . . . This method involves measuring the revenue requirements of all four scenarios over the period 1985-2020, and then comparing them at present value by applying a discount rate. Hence the importance of the selection of an appropriate discount

Differential in Present Worth
Additional Revenue Requirements
Increase (Decrease)
Over Base Case I—($Millions of 1985 $)[1]

|       | Base Case II | Base Case III | Base Case IV |
|-------|--------------|---------------|--------------|
| PECO  | 1,871        | 2,001         | 2,265        |
| OCA   | (1,501)[2]   | -             | -            |
| TS    | ( 121)[3]    | ( 321)[3]     | 223[3]       |
| GEC[4] |             |               |              |

. . . .

---

[1]Table employs a 9.64% discount rate.

[2]OCA Exh. RJC-11.

[3]Trial Staff Exhibit DHM-1A, Schedule 1, p.1 of 7 and Schedule 4, pp. 1 and 2. Trial Staff Assumptions.

[4]GEC St. 1 Exhibit CHS-4 and CHS-7. Expected Present Value of Savings (costs) of Base Case I With Cost Containment Program vs. Base Case II is $860 million[;] without cost containment (40) million. Discount Rate 9.64%.

*PUC Decision* at 48.

Considering this evidence, the Commission made the following finding:

[B]ased upon the [PUC trial] Staff's adjustments to the *Company's* assumptions for Base Cases III

---

rate. . . . Although the APV approach is not without problems . . . *the method is a valid tool to compare,* or select among alternative projects.

*ALJ Decision* at 199.

We note that the Trial Staff (TS) figures—which were found to be persuasive by the Commission, *see infra* this opinion—are based upon a *fifteen*-year analysis of the revenue requirements. *See* Trial Staff Exhibit DHM-1A, Schedule 4, Pages 1-2.

and IV, the present values of all Base Cases appear to be the same, as is shown in the foregoing table. There are numerous assumptions regarding both construction and O&M costs which underlie the conclusions reached which may or may not prove to be correct. . . . The result is that, based upon a present value analysis, the selection of any of the alternatives could be viewed as a reasonable choice. . . .

*PUC Decision* at 49. The Commission at the same time concluded "that there is no clear *best choice* among the alternatives analyzed," *id.,* and then found that

[b]ased upon all of the various modifications to the Company's estimates, we agree with GEC witness Stauffer, who suggests that there may be present value benefits to customers *if* Limerick Unit No. 2 were to be completed under a cost containment and operating plan.

*Id.*

We conclude that the record supports the Commission's findings in this respect. The Commission in undertaking the difficult task of predicting revenue requirements in the distant future clearly acted within its unique role as fact-finder when it accepted the evidence from trial staff demonstrating that only marginal present-value differences existed between completion of Limerick 2 and the proffered alternatives. That finding, in turn, supports the further determination that "any of the alternatives could be viewed as a reasonable choice. . . ." These are judgments beyond the power of this Court to overturn.

We are likewise of the view that the further finding that a cost-conditioned completion of Limerick 2 possessed present value benefits—thus making it an option—is supported by the record. Trial staff's testimony with respect to the present-value equivalence of the

various alternatives supports this finding and was, indeed, followed by its recommendation that PECO *"go forth* with Limerick 2" upon the conditions, notably, that "the direct dollars of the project not exceed the Forecase 7 level"[17] and "that a program of cost control be instituted for nuclear operations and maintenance expenses."[18] (emphasis added). This conclusion was based upon a thorough analysis of PECO's proposal and trial staff's adjustment thereof, and the PUC was, as fact-finder, clearly acting within its realm in adopting it. Further, as expressly referred to by the Commission, specific support as to present value benefits of a cost-conditioned completion derives from testimony of a GEC witness:

> Q. Did you consider the effect of a cost-containment scheme?
>
> A. Yes. We found that Option 1 (Limerick 1990) would be cheaper for rate-payers under a cost-containment scheme [under which] rates would not reflect capital and/or operating costs higher than the medium estimates nor a capacity factor lower than the medium estimate. Under such a cost-containment scheme, Option 1 (Limerick 2 in 1990) would be cheaper than Option 3 (Chester) by $425 million to $930 million depending on the discount rate and whether PJM or just PECO fuel savings were included.
>
> . . . . .
>
> The findings of my preliminary analysis are:
>
> . . . .

---

[17] *Staff Statement RAR-1* (Direct testimony of Robert A. Rosenthal) at 14. "Direct Dollars" refers to the amount of money necessary to complete construction of the plant. "Forecast 7" was PECO's estimate of costs which it used to demonstrate that Limerick 2 was the least-cost alternative.

[18] *Staff Statement RAR-1* at 14.

[5] A cost containment scheme would reduce the expected costs to ratepayers of the nuclear options and reduce the risks associated with the nuclear options.

*Testimony of Witness Stauffer, GEC Staff Statement No. 1 at 29, 38-39.*

The foregoing testimony, in our view, constitutes substantial evidence adequately supporting the Commission's findings. The record thus supports conditioned completion as a reasonable alternative among the modalities proposed to meet forecasted increased capacity needs.

C. *Adequacy of and Record Support for the Cost-Containment Plans*

### i. The Cost-Containment Plans

The option of conditioned completion was premised on PECO's compliance with the following cost-containment plans devised to address the various problems which made unconditioned completion not in the public interest. The first portion of the plan is addressed to the maximum investment to be allowed in rate base:

1. The maximum net rate base allowance for Limerick Unit No. 2 (exclusive of common plant) shall never exceed a prudent investment of $3,197.3 million.

2. Any of the investment (including subsequent capital additions) excluded by reason of the $3,197.3 million limitation shall not be recovered through depreciation expense or otherwise amortized.

3. Any of the initial investment (excluding capital additions as referenced in Paragraph No. 4) excluded by reason of the $3,197.3 million

limitation shall not thereafter receive rate base recognition, in whole or part, by reason of the reduction of net investment through depreciation accruals.

4. Any capital investment which occurs subsequent to commerical operation shall receive rate base recognition, only to the extent that the total net investment for ratemaking purpose[s] does not exceed $3,197.3 million.

*PUC Decision* at 87. In addition, an operational incentive plan was devised further intended "to protect the [predicted] economic benefits" of completion.[19] This plan established as an "annual capacity factor objective" a 65% level and provided that:

3. Operations within a range of ± 5 percentage points of the applicable annual capacity factor will not result in either an incentive or penalty.

4. The energy cost savings resulting from operating more than 5 percentage points above the annual capacity factor objective shall accrue to the stockholders and will not be reflected in the ratemaking process, in an amount not to exceed 5% of the common equity investment in Limerick Unit No. 2. . . .

---

[19] A major cost concern surrounding completion of Limerick 2 was that the plant would be unable to operate consistently at the capacity required to provide adequate service to the public. Ratepayers, it was alleged, could be adversely affected by poor operating results at Limerick if PECO was "permitted to fully recover the costs of all replacement power that is produced or purchased as a result of an inability of . . . Limerick 2 . . . to operate at efficient levels. . . ." PECO had predicted that, over time, a 65% annual capacity factor could be achieved. It was this level, notably, that was employed in the present value analysis which was given credence by the Commission. *See Staff Statement PHM-1* at 10.

    5. The additional energy costs incurred as a result of operating more than 5 percentage points below the annual capacity factor objective shall not be recovered by the Company, except to the extent that the additional expense shall exceed 10% of the common equity investment in Limerick Unit No. 2. [. . . .]

    6. The dollar amount of the incentive/penalty will be established for the life of the plant in the initial Limerick Unit No. 2 general rate proceeding.

*Id.* at 88-89. Finally, with respect to operation and maintenance costs, the Commission, noting its concern for "the potential escalation" of those costs, directed the establishment of a

program which, with data obtained from other nuclear plants, will identify expenditures that are out of line with results shown by regression equations and other statistical analyses, [resulting in this Commission] tak[ing] appropriate regulatory action.

*Id.* at 69. *And see PUC Order, id.* at 91 ("[T]he Bureau of conservation, Economics and Energy Planning and the Bureau of Rates are jointly assigned the task of developing the program with regard to operation and maintenance expense. . . .").

ii. *Petitioners' Challenge to the Cost-Containment Plans*

    As discussed in a prior portion of this opinion, the petitioners have challenged the very discretionary authority of the Commission *to fashion* such a program as that described above. We are not persuaded by that challenge. *See* Part 3(iv) of this Opinion.

    In addition, however, petitioners assail the components of the foregoing plans, charging that they are

neither supported by the record nor contrived in a manner sufficient to safeguard the public interest by effectively dealing with the specific cost concerns which originally rendered Limerick 2 *not* in the public interest. Respondents reply that the essential components of the plan were in fact drawn from testimony of record, and emphasize also that fashioning such a scheme embraces an undertaking clearly within the discretionary powers of the Commission "and that this Court must not, except in extraordinary circumstances, substitute its own judgment for that of the Commission."[20]

Our review of the record convinces us that the *framework* for the cost-containment scheme was indeed based upon the testimony of several parties in the proceedings below.[21] The issue of the specific components, however, raises a more difficult concern. OCA and GEC present significant questions with regard to the adequacy of these components, as formulated, to deal with the specific cost concerns surrounding Limerick 2. Both

---

[20] *Brief for PECO* at 43.

[21] A limit on the cost to completion was advanced by, among others, trial staff. *See Staff Statement RAR-1* at 14. A "program of cost control . . . for nuclear operations and maintenance expenses," *id.,* was also suggested by trial staff, as it was by GEC. *See GEC Statement 2* at 40. GEC also advanced an operational incentive plan, noting that such programs had been instituted in other jurisdictions. *See id.* at 59-60. The need to limit *post*-operation capital additions was also voiced:

> It would obviously undermine the effectiveness of a construction expenditure cap if all a utility had to do to avoid it was to defer expenditures or take shortcuts that necessitate significantly greater costs later on.

> Consequently, any post-operational capital costs that are determined to have resulted from construction period deferrals, shortcuts or inadequacies should be subject to the same potential disallowance as construction period costs under the original construction cap.

*Id.* at 54-55.

parties attack, for example, the fact that the specific containment level of O&M expenses, indisputably a concern surrounding Limerick 2, was left for subsequent treatment under a plan which will apparently disallow only such costs which are inconsistent with industry norms.[22] Similarly, the petitioners describe as arbitrary the Commission's allowing of rate base recovery for capital additions to the extent that total net investment for rate making purposes does not exceed $3,197.3 million.[23] Additionally, petitioners charge that the incentive/penalty plan is ineffective to provide the desired protection to rate payers, because a penalty is imposed only at a capacity level *"worse* than the level projected by the parties who have claimed that completion of Limerick 2 is more costly than reasonable alternatives."[24] Finally, petitioners assail the fact that the plans do not address the cost-aspects of decommissioning of the plant and the general issue of the likely useful life of the unit.

Our consideration of this attack on the methodology employed by the PUC is severely circumscribed by our prior recognition of the fact that formulation of this scheme is an administrative function performance of which is singularly within the expert domain of the PUC. Petitioners, of course, recognize that circumscribed scope of review, and, as recounted above, attempt to convince us that the scheme is arbitrary and capricious and thus subject to being overturned. While merit is to be found in portions of petitioners' argument, we detect no abuse of discretion and thus conclude that the Commission has engaged in a course of

---

[22] *Brief for OCA* at 51-54; *Brief for GEC* at 20-22.

[23] *See Brief for OCA* at 46.

[24] We note, however, that the 65% figure was that which PECO used in its forecast. *See supra* note 19.

regulatory action adequately based on the record developed in this case.

Pivotal in our conclusion is the pervasive, inherent problem involved herein concerning the prediction of costs to be incurred far in the future.[25] It would no doubt have been extremely gratifying for the Commission to have employed in its cost-containment plans precise ceiling levels for all costs which comported exactly with the factors employed in the particular present value analysis which demonstrated cost-conditioned completion of the unit to be comparable to the alternatives. Such was not, however, the PUC's duty. Having made the threshold determination that completion was a reasonable alternative, it devolved upon the Commission in this case only to develop a rational plan which in its expert judgment would render Limerick 2 in the public interest. There can be no argument that the framework for that plan was not of record, and this Court will not question the Commission's specific formulation of the components within that framework. The Commission's expert judgment, further, is especially to be accorded deference where, as here, intangible, speculative issues are sought to be resolved. *Cf. U.S. Steel Corporation v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 217, 390 A.2d 849, 859-60 (1978) (where utility sought amortization allowance for forecasted gas plant retirements and commission was alleged to have erred in not finding persuasive the *likelihood* of such retirements, *held:* such determination "is clearly one within the peculiar competence of the Commission to make. . . .").

We note also that, while the PUC has imposed a cost-containment scheme which does not conclusively and with absolute finality deal with each aspect of the

---

[25] On this count there is no disagreement among the parties.

cost concerns surrounding Limerick 2, the PUC is *still* charged in any case with allowing recognition in rate base only those costs which PECO in the future shows to have been *prudently* incurred. While by statute the Commission was charged with making a *present* analysis of whether completion of Limerick 2 was in the public interest, we find it entirely appropriate, given this general charge and the extreme difficulties involved in long-term predictions, for the Commission to have implemented, as it did, a cost-containment plan dealing contemporaneously with the objects of cost concerns which develop, by their very nature, at a future point.

We thus conclude that the PUC has implemented a cost-containment scheme consistent with its task in the present case and adequately supported by the record.

### 4. *Due Process Challenge to the Proceedings*

Petitioners also charge that their due process rights were violated by the way the Commission went about formulating and imposing the cost-containment plans. The Commission could not, petitioners argue, grant PECO's exceptions proposing its submission to a cost-containment plan and then formulate and implement such a plan without litigation of the issue by the parties. Petitioners conclude that due process required an opportunity for them to comment upon the various components of the plans, and that hence a remand is necessary for this purpose.

We recognize, of course, that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."[26] In the present case, however, we believe that requirement to have been met.

---

[26] *Brief for OCA* at 62 (quoting *Montefiore Hospital Association v. Pennsylvania Public Utility Commission,* 54 Pa. Commonwealth Ct. 279, 284, 421 A.2d 481, 484 (1980)).

From the time of the original show cause order the potential imposition of a cost-containment plan was manifest to all the litigants. Testimony was adduced on this subject by virtually all the parties, and an examination of the record demonstrates that more than an adequate opportunity for litigation was provided. Indeed, in the ALJ's recommended decision the issue of a cost-containment plan was a subject of considerable discussion. Among the ALJ's conclusions on this count was, in fact, that if the Commission did not share her finding that completion was not in the public interest, a cost-containment plan should be imposed against the utility. *See Recommended Decision* at 387-88. This conclusion could only logically follow litigation of the issue.

A rather pervasive charge in this portion of the appeal is that, while the *issue* of cost-containment may have been discussed during the hearings, PECO's opposition to such a plan *during* this period lulled the petitioners into refraining from actively litigating, from an *adversarial* point of view, the full benefits and detriments of cost-containment. PECO, under this argument, in fact acted disingenuously in submitting to the possibility of a cost-containment plan only at a point when it was too late for what we assume would have been vigorous litigation. *Cf. Brief for OCA* at 59:

> Another galling aspect of this case is that it rewards PECO's blatant attempts to bypass the Commission's adjudicating procedures. In the hearings, PECO opposed the concept of a cost-cap and only put forth proposals which all the parties agreed were unacceptable. After the ALJ recommended cancellation of Limerick 2, however, PECO offered . . . to negotiate a cost cap with the Commission. . . . PECO should not be given a second chance to look at a cost cap; it

should be barred from doing so because of its failure to support reasonable terms on the record.

*Id.* (quoting *PUC Dissent* at 59). *And see id.* at 61:

The offer to negotiate with the Commission on a construction cost program, after the ALJ has issued a decision, is inappropriate and offensive. PECO had ample opportunity to submit a bona fide proposal during the course of this proceeding. In [trial staff's] opinion, PECO's late-hour request for a cap, to be designed by the Commission and submitted to PECO for acceptance or rejection, indicates a lack of good faith on PECO's part in the record response to [trial staff]. In addition, *PECO's request for a Commission designed cap is inappropriate because it substantially impairs the due process rights of the parties and calls on the Commission to reach a result not based upon record evidence.*

*Id.* (quoting *Trial Staff Reply Exceptions* at 17-18) (emphasis added).

In our view, however, while PECO's change of disposition may have come as a surprise, that change did not by itself deprive PECO's adversaries of an opportunity to be heard on the merits of the cost-containment plan. The framework for the plans was in fact clearly upon the record and subject to examination and critiquing by the parties.

Petitioners also argue, following the PUC dissent, that when formulating a remedy such as that in the present case the Commission should properly have issued its order as only a "tentative decision[,] which would [have] allow[ed] the parties to file comments on the cost cap proposal." *PUC Dissent* at 5. We, however, detect no abuse of discretion in the Commission's issuance of its decision as a final order, given the fact that

84

the possiblity of a containment plan was clearly within the contemplation of the parties.

## 5. ·Conclusion

For the foregoing reasons, the order of the PUC is affirmed.

### ORDER

Now, February 18th, 1987, the order of the Pennsylvania Public Utility Commission, No. I-840381, dated December 5, 1985, is hereby affirmed.